COURT OF APPEALS OF VIRGINIA


Present:  Judges Petty, Alston and Senior Judge Coleman
Argued at Alexandria, Virginia


DAWN FARRELL
                                                          OPINION BY
v.        Record No. 1872-10-4              JUDGE ROSSIE D. ALSTON, JR.
                                                          JANUARY 10, 2012
WARREN COUNTY DEPARTMENT
 OF SOCIAL SERVICES


                FROM THE CIRCUIT COURT OF WARREN COUNTY
                            Dennis L. Hupp, Judge

            Howard J. Manheimer for appellant.

            Neal T. Knudsen for appellee.

            (Thomas H. Sayre, on brief), Guardian *ad litem* for the infant
            children.  Guardian *ad litem* submitting on brief.


        Dawn Farrell (mother) appeals the trial court's decision to terminate her parental rights to

her three infant children under Code § 16.1-283(B).  Mother contends that the trial court erred in

four respects.  First, mother argues that the trial court erred in basing its finding that the children

E. and W. were abused and neglected on its determination that the child A. was abused and

neglected.  Second, mother asserts that the evidence was insufficient to support the trial court's

finding that E. and W. suffered abuse or neglect that presented a serious and substantial threat to

their lives, health, or development.  Third, mother challenges the sufficiency of the evidence

supporting the trial court's finding that the conditions resulting in the neglect or abuse of the

three children could not be remedied within a reasonable period of time.  And fourth, mother

assigns as error the trial court's decision to terminate her parental rights without giving her an

opportunity to remedy the conditions leading to the children's removal.  For the following

reasons, we find that the trial court did not err in any aspect that mother raises and affirm the decision below.

## I. OVERVIEW

Because this case involves multiple hearings and decisions, we begin with an overview of the process that led to the ultimate result in the trial court. Code § 16.1-251 allows a juvenile and domestic relations district court (JDR) to enter an emergency order allowing the Department of Social Services (Department) to remove a child from his custodian's or parent's custody. The JDR court may issue this order *ex parte* so long as it is accompanied by a petition alleging that the child is abused or neglected and an affidavit or sworn testimony in person before a judge or intake officer. Code § 16.1-251. That affidavit or sworn testimony must establish that the child "would be subjected to an imminent threat to life or health to the extent that severe or irremediable injury would be likely to result" without the removal and that the Department has made reasonable efforts to prevent the removal but there are no less drastic alternatives that would "reasonably protect the child's life or health pending a final hearing on the petition." Code § 16.1-251(A).

The JDR court must then hold a preliminary removal hearing within five business days of the child's removal. Code § 16.1-251(B). At the preliminary hearing, the Department must prove by a preponderance of the evidence the same elements required to obtain the emergency removal order, specifically 1) imminent threat of injury or irremediable harm; 2) reasonable efforts to prevent removal from the home; and 3) no less drastic alternative than removal exists, for the JDR court to continue the child's removal from the home. Code § 16.1-252(E). Additionally, the JDR court "shall determine whether the allegations of abuse or neglect have been proven by a preponderance of the evidence," unless the parents or custodian, guardian *ad litem* or petitioning department objects. Code § 16.1-252(G). If a party to the proceeding

objects, then the JDR court must schedule an adjudicatory hearing on a date within thirty days of the preliminary hearing. Id. If no party objects, and the JDR court finds that the child at issue was abused or neglected, the JDR court must schedule a dispositional hearing for a date within seventy-five days of the preliminary hearing. Code § 16.1-252(H).

Regardless of whether the JDR court requires the Department to prove the abuse or neglect at the preliminary removal hearing or the adjudicatory hearing, the Department will have to establish that the child is abused or neglected under one of the definitions listed in Code § 16.1-228. For ease of reference, throughout this opinion we will refer to the JDR court's and trial court's decision on this issue as the "abused or neglected determination."

As noted above, once the JDR court finds a child to be abused or neglected, it may proceed to the dispositional hearing and take evidence on one of the dispositions listed in Code § 16.1-278.2. Code § 16.1-278.2(A)(7) allows, *inter alia*, the JDR court to "[t]erminate the rights of the parent pursuant to [Code] § 16.1-283." Because this case involves a termination of parental rights under Code § 16.1-283, we will refer to this final stage as either the "dispositional hearing" or the "termination decision." It is critical to understand that regardless of what subsection of Code § 16.1-283 the Department proceeds under, it must prove each of its allegations by clear and convincing evidence before the JDR court may terminate a parent's parental rights to his or her child. Santosky v. Kramer, 455 U.S. 745, 747-48 (1982). Moreover, a dispositional order entered pursuant to this statutory scheme is a final order from which a party may appeal in accordance with Code § 16.1-296. Finally, when an appeal is taken to the circuit court in a case involving termination of parental rights brought under Code § 16.1-283, the circuit court is obligated to hold a *de novo* hearing on the merits of the case within ninety days of the perfecting of the appeal. Code § 16.1-296(D).

## II. FACTS AND PROCEEDINGS BELOW

On appeal, "we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department." Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991) (citing Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)).

### A. The First Removal

So viewed, the evidence indicated that mother has been married to father at all relevant times to this case, and father is the biological father of all children involved in this case. Their daughter, E., was born on November 17, 2005. On the same day mother tested positive for cannabinoid, an illegal drug. On November 12, 2006, mother gave birth to premature twins, A. and W., and the twins tested positive for cocaine at birth. Just two days later, on November 14, 2006, mother tested positive for cocaine and tetrahydrocannabinol ("THC"). Mother did not obtain prenatal care prior to the births of the children and did not know she was having twins until shortly before they were born.

On November 17, 2006, the Warren County Department of Social Services (the "Department") summarily removed all three children from mother's and father's home. Following a hearing, the juvenile and domestic relations district court ("JDR court") found that all three children were abused or neglected as defined in Code § 16.1-228(1), each of them being a child:

> Whose parents or other person responsible for his care creates or inflicts, threatens to create or inflict, or allows to be created or inflicted upon such child a physical or mental injury by other than accidental means, or creates a substantial risk of death, disfigurement or impairment of bodily or mental functions . . . .

In January 2007, the JDR court entered a dispositional order, vesting custody of all three children with the Department. The JDR court also approved foster care plans for the children,

requiring both mother and father to: maintain adequate housing, maintain income, provide household bills to the Department, maintain contact with the children, complete parental capacity evaluations, complete substance abuse evaluations and treatment, submit to drug screens, and execute releases so the Department could monitor the situation. In July 2007, the Department returned the three children to mother's and father's physical custody. In October 2007, mother and father completed their obligations under the foster care plans, and the JDR court restored full legal custody to them for all three children.

### B. A.'s Medical Problems and the Second Removal

On November 16, 2007, mother and father brought A. to a medical appointment with his pediatrician, Dr. Deborah Dunn. Dr. Dunn expressed concerns to mother and father about A.'s low weight and malnourishment. A. was suffering from what Dr. Dunn later discovered was a milk allergy. Dr. Dunn scheduled a follow-up appointment for December 17, 2007, but neither parent brought A. to see Dr. Dunn on that date, nor did they reschedule the appointment.

On March 17, 2008, mother took A. to the emergency room at Warren County Memorial Hospital ("Warren County") because he was vomiting uncontrollably.[1] On April 2, 2008, Dr. Dunn saw A. again for the first time since the November 2007 appointment, when A. was referred to her after mother brought him to the emergency room for vomiting. Dr. Dunn testified that at this point A. was extremely thin and very sick, vomiting, and listless. Dr. Dunn sent A. to Warren County, where he spent a week recovering from his malnourishment. At trial, Dr. Dunn testified that she had never seen another child so malnourished from a milk allergy. Dr. Dunn

---

[1] At trial, mother provided various conflicting accounts of how A. sustained a head injury shortly before the vomiting began. She testified that although she believed that A. had fallen down the stairs prior to this visit, she did not tell the doctors about it. Mother also testified that a few days prior A. had hit his head on a coffee table, but she did not seek any treatment for A. at that time because he did not cry or seem hurt, although she acknowledged that the blow left a mark. Additionally, mother asserted that W. hit A. on the head with a Tonka truck later in March.

also noted that A.'s condition would not have become so severe if mother or father had brought A. back for his scheduled follow-up visit in December 2007.

On April 30, 2008, father allegedly returned from speaking with someone outside the home and found A. draped over a chair with one side of his body rigid, appearing as if he were having a seizure. Father administered rescue breathing and called for an ambulance. Mother was not present at the home when this incident occurred but drove to the emergency room after hearing of the incident while father stayed at home with the other two children. After being stabilized in the emergency room at Warren County, doctors transferred A. to University of Virginia Children's Hospital ("UVA"). A.'s treating physician and specialists at UVA diagnosed him with subdural hematomas of varying ages along with bilateral retinal hemorrhaging. Dr. Patricia Scherrer, a pediatric critical care specialist who examined A. and oversaw his treatment at UVA, concluded that A.'s head injuries were most consistent with non-accidental trauma. Dr. Scherrer based this conclusion on the lack of history to explain A.'s injuries and further testified that none of the parents' proposed explanations – A.'s allegedly hitting his head on the coffee table or being hit on the head with a Tonka truck – could have caused the type of injuries A. had sustained. Dr. Scherrer testified, contrary to mother's explanations at trial, that she knew nothing about a fall down the stairs, and mother admitted that she did not tell Dr. Scherrer about the fall. Dr. Dunn reviewed the reports from UVA and testified at trial that she also believed A.'s injuries were consistent with non-accidental trauma.

On May 1, 2008, the Department filed a petition for emergency removal of the three children and removed them from the parents' custody a second time. The following day, May 2, 2008, the Warren County Sheriff's Office started an investigation regarding the circumstances of A.'s injuries. Investigator Raymond Fogle interviewed mother and father about A.'s injuries. During this interview, father explained to Investigator Fogle that A. had fallen down some stairs

in the family home in early March 2008. Investigator Fogle was unable to conduct any further interviews with mother and father because their attorneys advised the sheriff's office that neither parent would make any additional statements to the police while the civil case proceeded through the courts.

At trial father testified consistent with his discussion with Investigator Fogle about the fall. Father stated that he had put a gate up at the top of the stairs and went down to the basement. He speculated that A. and E. struggled at the gate and A. somehow fell down the stairs into the basement. Father testified that he found A. unconscious at the bottom of the stairs and had succeeded in reviving him through infant CPR. After A. regained consciousness, father stated that A. began running and playing with his siblings and, as a result, father did not seek medical attention for him.

### C. Proceedings in the JDR court

After the Department removed the children from the parents a second time, the JDR court held a preliminary hearing on May 9, 2008. The parents objected to the JDR court's determination of abuse or neglect at this hearing, and the JDR court set an adjudicatory hearing for June 6, 2008. At that hearing – which actually occurred on July 8, 2008 – the JDR court found that A. was abused or neglected and that E. and W. were at risk of being abused or neglected due to the parents' treatment of A. The JDR court then scheduled the dispositional hearing for September 19, 2008, noting that the parties waived the requirement for a hearing within seventy-five days. On September 11, 2008, the Department filed petitions for termination and petitions requesting a foster care review hearing with the stated goal of adoption for each child.

After the dispositional hearing, the JDR court entered an order on January 12, 2009, terminating both parents' parental rights to the three children pursuant to Code § 16.1-283(B).

Both parents appealed to the circuit court. The circuit court (hereinafter "trial court") held evidentiary hearings *de novo* on November 5, 6, and 30, 2009, to determine the merits of the abuse or neglect allegations. After determining that the children were abused or neglected, the trial court set a dispositional hearing for December 8, 2009.

### D. The Abused or Neglected Determination in the Trial Court

At the hearing on the abuse or neglect petition, Jennifer Mundy testified that she had been the children's foster mother during the first removal from November 2006 through July 2007. She asserted that father had called her in early April 2008, looking for work. Mundy stated that when she asked about the children, father admitted that A. had fallen down the stairs but said he and mother brought him to the hospital because A. started uncontrollably vomiting a few days later. Additionally, Mundy testified that during the same conversation, father said that mother told the Department that A. had hit his head on a coffee table because they were worried about the Department taking the children again. According to Mundy, father gave her the room number for A. at the hospital, and Mundy called the room to talk with mother. Mundy testified that when she told mother she knew about the fall down the stairs, mother said, "[Father] shouldn't have told you that," and that "the doctors know enough already."

Similarly, Jennifer Mitchell, a case worker for the Department, testified that she made an unannounced visit to the Farrells' home on April 1, 2008. Mitchell explained that she went to the home to investigate a report of a bruise on A.'s face and his visit to the emergency room for vomiting and weight loss. When Mitchell asked mother about both issues, mother gave Mitchell the explanation about the coffee table but did not mention the fall down the stairs. Mitchell also spoke with mother when she was at UVA with A. and asked mother to think about anything else that happened to A. in the last few months that could have caused head injuries. Mother referred

to an incident when W. hit A. in the head with the Tonka truck and again referred to the coffee table incident, but still did not mention the fall down the stairs.

The parties presented testimony and physical exhibits over the course of a three-day hearing on the abused or neglected petition as summarized above. At the end of the second day of the hearing, the Department concluded its evidence, and mother made a motion to strike. Mother argued in her motion that the Department presented no evidence that E. and W. had actually been abused or neglected and that the trial court did not have jurisdiction to find E. and W. at risk of being abused or neglected by reason of A.'s abuse or neglect because no court had previously adjudicated mother as having abused or neglected A. After argument on mother's motion, father made a motion to strike on the same grounds. The trial court denied both motions, stating:

> I find, first, that the Court has jurisdiction of these cases under [Code §] 16.1-241. With respect to [A.], keeping in mind the standard here is a prima facie case, and . . . whether the [D]epartment has made a prima facie case that's shown that he's been abused or neglected by his parents and also, of course we know that the evidence [is viewed] in the light most favorable to the [D]epartment at a motion to strike stage.

> But applying that standard, there's ample evidence to show that [A.] has been abused and neglected by his father and neglected by his mother.

> Now, as far as the other children are concerned, this is a more difficult analysis. Again, at this stage, I find that the [D]epartment has shown a prima facie case that the other two are at risk because of the abuse and neglect of [A.], and I'm looking at [Code §] 16.1-278.2 . . . when I say that, but also, I find that there's a prima facie that [sic] they, too, are abused or neglected under the definition contained in [Code §] 16.1-228.

Following the court's denial of the motions to strike, mother presented her case-in-chief. Mother testified that she had another child in June 2009, F., and that she had not obtained prenatal care during her pregnancy with F. Mother explained that she did not have medical

insurance during her pregnancy but was receiving Medicaid for F., and F.'s drug test at birth came back negative. Mother also asserted that F. was a healthy baby, and the Department had not initiated any investigation into mother's and father's treatment of F. Mother admitted on more than one occasion during the trial that she and father had gotten into a physical altercation during an argument in January 2007. Although it was unclear who called the police, officers came to the house and arrested father. Mother testified that the case against father related to that incident was eventually dismissed.

In his case-in-chief, father testified that the January 2007 argument and physical altercation occurred when he was reviewing bills and confronted mother about approximately $8,000 that was missing. When asked whether mother had used that money to purchase drugs, father was unwilling to concede that he believed she had. He testified that he never found out what happened to the money and that it was still missing. Father did state, however, that he found mother's cocaine source and firmly told the person that mother was pregnant (with the twins W. and A.) and to stop selling drugs to her. When asked about the children's interactions with one another, father described A. as "selfish, spoiled," and needing "to be the center of attention." Father also testified that if the children were returned he would have to "work on A.'s attitude."

Following closing arguments, the trial court stated:

> All right. Well, it's clear to me that [A.] was abused and neglected. The types of injuries that he sustained are not injuries that you get in routine play, falls around the house. It takes a great violence to inflict that type of injury, bilateral subdural hematoma, bilateral retinal hemorrhages, which were diffuse. These are a result of, again, great violence.
>
> Of course, the additional disturbing thing with respect to the subdural hematomas is that they were of various ages, which would indicate that he perhaps suffered the same type of abuse in the past.

No explanation has been offered by the person in whose care he was at the time as to how this happened. I have no hesitation in finding [father] abused [A.] and inflicted these injuries, given the evidence that I have heard.

[Father's] credibility has suffered in this courtroom because of the contradictions and inconsistencies in his testimony and the contradictions between the testimony of the two parents. I also find from his testimony that there is some animus towards [A.]; he's selfish; he's an attention-getter; he's difficult; he throws temper tantrums, and all this stuff, almost as if shifting the blame to [A.] for this whole episode.

As far as neglect, I think both parents are guilty of neglect. It went far too long between doctor visits when [A.] was a malnourished child, I mean, 16 pounds at 18 months of age. So there's no question that [A.] is abused and neglected, abused and neglected by [father] and neglected by [mother].

Now, the more difficult question remains with respect to [W.] and [E.], and quite frankly, I need some time to think about that.

The following day, December 1, 2009, the trial court issued a memorandum opinion to counsel reiterating its finding that father abused and neglected A. and mother neglected A. The memorandum also stated:

I find that [E.] and [W.] are in danger of death, disfigurement or impairment of bodily or mental functions at the hands of their parents by reason of the abuse and neglect of their sibling, [A.] This latter form of abuse or neglect is recognized by statute. I refer to . . . Code § 16.1-278.2(A). Hence, I find that they are abused and/or neglected under the definition set forth in . . . Code § 16.1-228(1). In making this determination, I also have in mind the history of these parents which includes a previous removal of these children from their home.

E. The Dispositional Hearing in the Trial Court

On December 8, 2009, the trial court held a dispositional hearing to determine whether to grant the Department's request to terminate the parents' parental rights to all three children.

The Department commenced its case with the testimony of Dr. Bernard Lewis, a clinical psychologist and an expert in parental capacity examinations. Dr. Lewis testified that he had

evaluated both mother and father in 2007 at the Department's request and then again in 2009 to update the 2007 evaluations. Specific to mother, Dr. Lewis testified that she suffered from major depressive disorder, engaged in episodic cannabis abuse, had a history of cocaine abuse in apparent full remission, and had negative, paranoid, and dependent personality features. Dr. Lewis testified that during his interviews with mother, she admitted she had lied to him during the 2007 evaluation about her substance abuse issues. Dr. Lewis also noted that mother was affected by a dysfunctional marital relationship, financial problems, and difficulty accessing mental health care. Specific to mother's parenting abilities, Dr. Lewis noted that she had a strong and positive attachment to each child with the appropriate degree of concern about their issues and problems. Additionally, Dr. Lewis testified that mother's parenting skills were basically good, indicating her potential to adequately parent the children if she could resolve certain issues including depression, substance abuse, and her relationship with father. He also stated that mother had difficulty acknowledging her own responsibility and contribution to the problems in her life. Dr. Lewis emphasized that if mother were unable to acknowledge that someone abused A., she would be likely to allow A. to be in a similar situation again and thus, put at risk. The inability to acknowledge the abuse, Dr. Lewis testified, would also affect mother's ability to take appropriate safety measures if A. were back in her custody. Moreover, mother told Dr. Lewis that A. had anger and temper problems during her visits with him and was "a violent child."

In response to further questioning, Dr. Lewis made several recommendations under the hypothetical assumption that the trial court would return the children to mother. He stated that mother would need a prescription medication for depression along with individual counseling for her relationship problems with father and for substance abuse. Dr. Lewis admitted that some people with drug abuse problems need to go through counseling four or five times before they

are able to remain completely abstinent and that there was no way to predict whether a second round of substance abuse counseling would be successful for mother. Dr. Lewis believed that mother could remedy her depression issues within one year but cautioned that returning the children to both parents with their current relationship problems was dangerous. Specifically, he noted that mother's co-dependency on father made her unable to acknowledge that father's presence was harmful to the children and put them at risk.

Dr. Lewis testified that his evaluation of father led him to conclude that father suffered from alcohol dependence, a history of polysubstance abuse - most recently marijuana, narcissistic personality disorder with antisocial traits, and back pain and cognitive impairment. Dr. Lewis also testified that father thought that he was the victim of a conspiracy in which others were out to harm him. Dr. Lewis also stated that father's occupational and financial problems were affecting him negatively. Specific to father's parenting abilities, Dr. Lewis found considerable problems with father's approach because father lacked understanding about children's developmental stages and his own strengths and weaknesses. When reviewing father's disciplinary approach, Dr. Lewis noted that father would remove the children from the situation and yell at them and that father believed "growling" worked well. Dr. Lewis emphasized that father could not think of anything he could have done differently prior to the children's removal except that he would have taken the children to the doctor instead of letting mother do it and would have told the Department, "No, you're not taking my kids." Additionally, Dr. Lewis noted father's admission that he needs a "refresher course" on how to deal with A., whom he described as a very trying child to deal with. According to Dr. Lewis, father also admitted to him that father has no support network for parenting issues and no one to ask questions of or talk to.

When asked for his recommendations regarding father, Dr. Lewis stated that father had "a great deal of work" to do before he could be considered a minimally adequate parent. Dr. Lewis also testified that he had serious concerns about father's parenting ability should father and mother remain together and get the children back. Dr. Lewis recommended before the Department or the trial court returned the children to father, that father attend a sobriety maintenance support program to help him remain free of alcohol and drug usage and engage in individual counseling. Most relevant to the children, Dr. Lewis recommended that the trial court require father to attend and complete an individualized parenting skills program that included specific education about A.'s developmental and emotional issues and provided techniques for addressing the issues in the home.

The Department then presented the testimony of one of its representatives, Melanie Trabosh. Ms. Trabosh testified about the Department's unsuccessful efforts to find a family member willing to take custody of the three children. She noted that the children's current foster family was willing to adopt them. Ms. Trabosh admitted that the Department's initial pleading included a goal of adoption following the most recent removal, not returning the children to the parents, because the parents refused to discuss A.'s injuries with them. Without any discussions, Ms. Trabosh testified, she was unable to create a list of services to provide to mother and father.

Estelle Wilson, the children's current foster mother, corroborated Ms. Trabosh's testimony that Ms. Wilson and her husband were willing to adopt the children. She testified about the positive behavioral changes in each child and their attitudes toward one another since they began living with her. Ms. Wilson also mentioned that she and her husband received training for children with special needs.

Following Ms. Wilson's testimony, and at the conclusion of the Department's case, mother and father both made motions to strike the Department's evidence supporting the

petitions for termination. Mother argued two main points in her motion. First, she contended that termination was not proper because the Department had failed to establish that her neglect of A. - which she referred to as "missing one doctor's appointment" - did not create a serious and substantial threat to the children's lives or health. Second, mother asserted that the Department could not sustain its burden on the second component of the statute: that no services could achieve reunification within a reasonable amount of time in light of Dr. Lewis's testimony. The trial court denied mother's motion to strike, finding that the Department had made a prima facie case for termination under Code § 16.1-283(B). The trial court also denied father's motion to strike based on the same rationale.

Following the motions to strike, Ms. Trabosh testified again, this time as part of mother's case-in-chief. Ms. Trabosh testified that she felt mother's contact with the Department was insufficient because an unknown abuser inflicted a severe injury on A. and mother continued to deny that someone intentionally harmed A. Ms. Trabosh mentioned that mother told her she looked on the Internet for other potential causes for A.'s brain injuries even after discussing the medical diagnosis with Dr. Dunn and Dr. Scherrer.

In support of her case, mother testified that she benefited from the Department's services when the Department removed the children the first time and believed she could benefit from further services. Mother also asserted that she would do whatever the Department asked, including leaving father and preventing him from having any contact with the children. Mother again denied any medical neglect of A. other than "missing one doctor's appointment." Mother admitted that she smoked marijuana after the Department removed the children the second time, in May 2008.

Father's mother, Irene Farrell, testified on father's behalf. She stated that she wanted to adopt only one of the children, E., because she did not think her health problems and age would

- 15 -

permit her to take care of all three children. Ms. Farrell admitted that father threatened father's sister, Ms. Farrell's daughter, when the sister had custody of the children during the first removal. Additionally, Ms. Farrell stated that the parents told her that the Department removed the children because A. had fallen down the steps or hit his head on a coffee table.

At the close of the evidence, both parties renewed their motions to strike. The trial court denied both motions, and the parties presented closing arguments. The trial court took the matter under advisement and eventually entered orders terminating both mother's and father's parental rights to all three children. As to A., the trial court found that A. was abused by father and neglected by mother. Further, the trial court found by clear and convincing evidence that it was in A.'s best interest to terminate both parents' rights to him and that the neglect or abuse A. suffered presented a serious and substantial threat to his life, health, and development. Specifically, the trial court concluded:

> The abuse of [A.] by [father] constitutes "aggravated circumstances" as defined by Code . . . [§] 16.1-283. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow [A.'s] safe return to his parents within a reasonable period of time. In making this determination, the court takes into consideration the efforts made to rehabilitate the parents by public and private social, medical, mental health and other rehabilitative agencies prior to [A.'s] initial placement in foster care. [A.] suffered grievous injuries and the Court rejects the parents' explanation for same. The Court considers the entire case in the context of this being the second removal of [A.] by the courts. The Court further notes that substance abuse was a significant factor in the first removal, and substance abuse continued to be a problem following the return of the children . . . .

The trial court also terminated both parents' rights to E. and W. In separate orders, the trial court made identical findings that both E. and W. were abused or neglected children whose best interest was served by terminating both parents' rights to them. Particularly, the trial court stated:

The Court further finds . . . by clear and convincing evidence, that:

\* \* \* \* \* \* \*

3. The neglect or abuse suffered by [E./W.] presented a serious and substantial threat to [her/his] life, health and development. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow [E.'s/W.'s] safe return to [her/his] parents within a reasonable period of time. In making this determination, the court takes into consideration the efforts made to rehabilitate the parents by public and private social, medical, mental health and other rehabilitative agencies prior to [E.'s/ W.'s] initial placement in foster care. [E.'s/W.'s] brother [A.] suffered grievous injuries, and the Court rejects the parents' explanation for same. I find that [E./W.] is in danger of death, disfigurement or impairment of bodily or mental functions at the hands of [her/his] parents by reason of the abuse and neglect of [her/his] sibling, [A.]. This latter form of abuse or neglect is recognized by statute. I refer to . . . Code § 16.1-278.2(A). Hence, I find that [she/he] is abused and/or neglected under the definition set forth in . . . Code § 16.l-228(1). In making this determination, I also have in mind the history of these parents which includes a previous removal of [E./W.] from [her/his] home. Substance abuse was a significant factor in the first removal, and substance abuse continued to be a problem following the return of the children . . . .

For all three children, the trial court further found that the Department investigated all reasonable options for placement with relatives, and no reasonable alternatives existed.

Both parents timely noted their appeals. During the pendency of the appeal, father and mother filed identical motions to vacate the judgments for fraud on the court. The Department filed a written response, and the trial court concluded that it did not have jurisdiction because the cases were on appeal to this Court. Neither party noted any subsequent appeals following that order.

III. ANALYSIS

When reviewing a termination of a parent's residual parental rights, we must acknowledge that "'[t]he termination of residual parental rights is a grave, drastic and irreversible action.'" Helen W. v. Fairfax Cnty. Dep't of Human Dev., 12 Va. App. 877, 883,

- 17 -

407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Dep't of Pub. Welfare, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)).  While recognizing the seriousness of such a determination, we must presume that the trial court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's [or children's] best interests.'" Fields v. Dinwiddie Cnty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005) (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)).  Moreover, in a parental rights termination case, "[t]he trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 266, 616 S.E.2d 765, 769 (2005) (quoting Fields, 46 Va. App. at 7, 614 S.E.2d at 659).  "In its capacity as factfinder . . . the [trial] court retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'"  Id. (quoting Farley, 9 Va. App. at 328, 387 S.E.2d at 795).

A.  Abuse and neglect of A. as basis for finding E. and W. abused or neglected

Mother contends that the trial court had insufficient evidence as a matter of law to find that E. and W. were abused or neglected because it based this determination solely on its finding that mother neglected A.  We disagree.

Because mother is challenging the abused or neglected determination separately from the termination decision, we will limit our analysis in this section to the hearings and decisions ending with the trial court's December 1, 2009 memorandum opinion.

After finding that father abused and neglected A. and that mother neglected A., the trial court found that E. and W. were "in danger of death, disfigurement or impairment of bodily or mental functions at the hands of their parents."  In reaching this conclusion, the trial court referred to the abuse and neglect of A., citing Code §§ 16.1-278.2(A), -228(1), and the parents'

history with the trial court pertaining to the chilren, including a previous removal of the children from their home.

Although mother terms this assignment of error a "sufficiency of the evidence challenge," we also consider it a challenge to the basis for the trial court's decision as a matter of law. Accordingly, we will initially analyze the issue as a question of statutory interpretation, under a *de novo* standard. See Syed v. ZH Techs., Inc., 280 Va. 58, 69, 694 S.E.2d 625, 631 (2010). We will then address mother's sufficiency argument and affirm the trial court's determination unless it was plainly wrong or without supporting evidence. See Toms, 46 Va. App. at 266, 616 S.E.2d at 769.

Code § 16.1-228 defines the terms used in child abuse and neglect cases, and subsection (1) states:

> When used in this chapter, unless the context otherwise requires:
> *"Abused or neglected child"* means any child:
>
> Whose parents or other person responsible for his care creates or inflicts, threatens to create or inflict, or allows to be created or inflicted upon such child a physical or mental injury by other than accidental means, or creates a substantial risk of death, disfigurement or impairment of bodily or mental functions . . . .

In its December 1, 2009 memorandum opinion, the trial court based its decision that E. and W. were abused or neglected on the parents' history, including a previous removal of all three children, and its finding that the parents abused or neglected A. The trial court also found that E. and W. were "in danger of death, disfigurement or impairment of bodily or mental functions at the hands of their parents," tracking the language of Code § 16.1-228(1). Mother alleges that the trial court based its decision solely on her and father's treatment of A., however,

- 19 -

the plain language of the trial court's memorandum opinion indicates that it had additional bases for its decision: namely, the history of the parents, including a previous removal. [2]

We have previously upheld a trial court's abused or neglected determination based on a parent's history and treatment of other children. In Jenkins, 12 Va. App. at 1183, 409 S.E.2d at 19, we upheld a trial court's abused or neglected finding of a mother's newborn child based on previous findings of abuse or neglect of her other three children and her history with the court. We discussed the language of Code 16.1-228(1) and held:

> [T]he statutory definitions of an abused or neglected child do not require proof of actual harm or impairment having been experienced by the child. The term "substantial risk" speaks *in futuro* . . . .
>
> Accordingly, we hold that the Code contemplates intervention in such circumstances by allowing for the emergency removal of children before placement into an environment where "the child would be subjected to an imminent threat to life or health to the extent that severe or irreversible injury would be likely to result if the child were returned to or left in the custody of his parent . . . ." Code § 16.1-251(A)(1).

Jenkins, 12 Va. App. at 1183, 409 S.E.2d at 19. Thus, we find that the trial court did not err, as a matter of law, in basing its determination that E. and W. were abused or neglected on the parents' history before the court and the abuse and neglect of A.

Moreover, ample facts support the trial court's determination that E. and W. were in danger of death, disfigurement or impairment of bodily or mental functions, because an unsafe environment existed for all three children, even viewing mother in isolation from father. It cannot be reasonably disputed that mother's continued drug use created an unsafe environment

---

[2] We decline to address whether a trial court could rely solely on a prior adjudication of a parent's neglect or abuse of a child's sibling to find that the child was also abused or neglected. However, we note that Code § 16.1-278.2(A) provides termination of parental rights as a potential remedy once a trial court has determined that a parent has previously abused or neglected another child.

for all three children. Mother's substance abuse problems led to the first removal of all three children, and mother admitted that she smoked marijuana after the Department removed the children the second time.

In addition, mother's failure to adequately address A.'s medical needs supported the conclusion that the mother created an unsafe environment for all three children. Dr. Dunn testified that she saw A. in November 2007 and expressed concerns to mother about his weight and malnourishment, yet mother allowed six months to go by before A. saw Dr. Dunn again; and this visit was brought about by a separate incident threatening A.'s health and safety. On that date – April 2, 2008 – Dr. Dunn saw A. more malnourished from a milk allergy than she had ever seen a child and admitted him to the hospital for a week.

Finally, mother's inability to acknowledge the physical abuse father inflicted on A. created a patently unsafe environment for all three children. In this regard, the trial court heard testimony from Jennifer Mundy and others who indicated that mother was attempting to conceal information from A.'s doctors when he was admitted to the hospital again in late April. Mother repeatedly testified that she did not know how A. had sustained his brain injuries, but that she had not hit or shaken A. and refused to believe that father had caused A.'s injuries. Yet, mother admitted that she and father had gotten into a physical altercation that required police involvement and led to charges against father.

This Court's decision in <u>Jenkins</u> not only supports the trial court's legal analysis, but the salient facts also support the trial court's conclusion on this issue. As in <u>Jenkins</u>, the trial court in this case could have reasonably found that mother had allowed an environment to exist "that presented a substantial risk of impairment to the bodily or mental functions of [E. and W.] if the Department . . . allowed the child[ren] to be subjected to those conditions." 12 Va. App. at 1183, 409 S.E.2d at 19. When Code §§ 16.1-228(1) and -251(A)(1) are considered together, as was the

- 21 -

case in Jenkins, these sections contemplate court intervention upon a finding of abuse or neglect of other children, provided that the environment in a parent's home still presents the requisite threat to a child's welfare. Id. Moreover, we note that the circumstances of the instant case are arguably more compelling than the situation in Jenkins, in that the trial court in Jenkins had not previously removed the child at issue from the home. Significantly here, the trial court specifically noted that mother's children, including E. and W., were removed once before. Thus, we hold that the evidence was sufficient to support the trial court's determination that E. and W. were abused or neglected.

Because the plain language of Code § 16.1-228(1), the trial court's memorandum opinion, our decision in Jenkins, and the evidence in the record support the trial court's decision, we find no merit in mother's assignment of error on this issue.

### B. Evidence of neglect and abuse that E. and W. suffered

Mother asserts that the plain language of Code § 16.1-283(B)(1) requires evidence that a child actually suffered neglect or abuse before a trial court may terminate residual parental rights and that the record contains no evidence that mother actually neglected or abused E. or W.

We will view the evidence in the light most favorable to the Department because it was the prevailing party below. Jenkins, 12 Va. App. at 1180, 409 S.E.2d at 17. Additionally, we will not reverse the trial court's conclusion on this issue unless it is plainly wrong or without supporting evidence. Toms, 46 Va. App. at 266, 616 S.E.2d at 769. In contrast to mother's first assignment of error, this second assignment of error challenges the trial court's termination decision, not the abused or neglected determination.

At the Department's request, the trial court evaluated the cases for termination under Code § 16.1-283(B), which required the trial court to make the following findings:

> [B]ased upon clear and convincing evidence, that . . . [termination]
> is in the best interests of the child and that:

1. The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and

2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. . . .

Consistent with the United States Supreme Court's decision in Santosky v. Kramer, 455 U.S. 745, 747-48 (1982), the Fourteenth Amendment's Due Process Clause requires the Department to prove each of its allegations by clear and convincing evidence before the court will terminate mother's residual parental rights to her children.

The trial court's orders for both E. and W. included these statutory findings by clear and convincing evidence, and its finding that E. and W. were neglected or abused was taken nearly verbatim from Code § 16.1-228(1).[3] Specific to mother's argument, the trial court found "by clear and convincing evidence" that "[t]he neglect or abuse *suffered by* [E. and W.] presented a serious and substantial threat to [her/his] life, health and development." (Emphasis added).

_____

[3] In the final termination orders for E. and W., the trial court summarized and reiterated the findings it made by a preponderance of the evidence regarding whether E. and W. were abused or neglected. Applying the preponderance of the evidence standard to the abused or neglected determination in and of itself is appropriate under Code § 16.1-252(G), and after that determination, Code § 16.1-278.2(A)(7) allows a trial court to proceed to terminate parental rights as a potential remedy. Once a trial court proceeds to the termination decision, however, pursuant to Santosky, Code § 16.1-283(B) mandates that the trial court require the Department to prove each element by clear and convincing evidence. In this case, the trial court applied the appropriate burden and stated in its final termination orders for E. and W.:

The Court further finds . . . by clear and convincing evidence, that:

\*      \*      \*      \*      \*      \*      \*

I find that [E. and W. are] in danger of death, disfigurement or impairment of bodily or mental functions at the hands of her parents by reason of the abuse and neglect of her [/his] sibling, [A.]. This latter form of abuse or neglect is recognized by statute. I refer to Virginia Code § 16.1-278.2(A). Hence, I find that she [/he] is abused and/or neglected under the definition set forth in Virginia Code § 16.l-228(1).

Mother argues that the trial court could not base this finding on the facts in the record because the record contained no evidence that father or mother actually neglected or abused E. or W. We disagree. The trial court cited mother's and father's substance abuse and the history of the prior removal in its final order. This evidence, in addition to other evidence in the record, supports the conclusion that mother neglected E. and W. For example, mother admitted that she had no prenatal care for any of her children, tested positive for cannabinoid when E. was born, and tested positive for cocaine and THC when W. was born. Mother did not dispute that W. was born with cocaine in his system. Moreover, mother admitted that she smoked marijuana in May 2008, after the Department removed the children the second time. She used illegal drugs again despite the Department's provision of substance abuse counseling during the first removal.

Moreover, Dr. Lewis testified extensively about mother's history with the Department dating back to the first removal in 2007, including mother's admission that she had lied to Dr. Lewis about her substance abuse during the 2007 evaluation. Dr. Lewis noted that mother suffered from episodic cannabis abuse with a history of cocaine abuse, along with dependent personality features. He also stated that mother had a potential to adequately parent her children provided that she could resolve her issues with depression, substance abuse, and her relationship with father.

Most relevant to E. and W., however, Dr. Lewis further testified that mother had difficulty acknowledging her contribution to the problems in her life, specifically related to her relationship with father, because she refused to acknowledge that father's presence was harmful to the children and placed them at risk. Dr. Lewis further testified that returning the children to the home with both parents living together would be dangerous. He asserted that mother would need to demonstrate that she understood leaving the children with father could put them at risk before the children could safely return to her care. Dr. Lewis referred to this issue between

mother and father as "co-dependency" and testified extensively about the treatment that mother would need to overcome her enabling behavior.

Consistent with Dr. Lewis's diagnosis, mother repeatedly stated that she did not believe that anyone had intentionally inflicted A.'s injuries upon him and testified that she wanted the doctors to consider research she obtained from the Internet about other possible causes for the injuries. When specifically asked about Dr. Scherrer's opinion that A.'s injuries were consistent with non-accidental trauma, mother stated that she did not believe Dr. Scherrer's conclusion.

The trial court based its finding that E. and W. were actually neglected on mother's continued substance abuse and her history with the Department and the court. We cannot say that this conclusion was plainly wrong. See Butler v. Culpeper Cnty. Dep't of Soc. Servs., 48 Va. App. 537, 550, 633 S.E.2d 196, 202 (2006) (relying on a mother's continued drug use to support terminating her parental rights under Code § 16.1-283(B)). Because evidence in the record amply supports the trial court's decision, and it is not plainly wrong, we affirm the trial court's finding that E. and W. suffered from abuse or neglect that presented a serious and substantial threat to their lives, health and development.

### C. Sufficient evidence that mother could not remedy offending conditions in reasonable period of time

Mother also challenges the trial court's finding on the second statutory requirement under Code § 16.1-283(B): that it is not reasonably likely that she could remedy the conditions resulting in the removal of the children in a reasonable period of time. Mother argues that the evidence is insufficient to support this finding because Dr. Lewis enumerated several services that the Department could provide to her to effectuate the children's safe return to her care. To the contrary, Dr. Lewis's testimony, evidence of mother's pattern of lying, and the evidence about the children's prior removal, supported the trial court's finding on this issue.

We have repeatedly held that Code § 16.1-283(B) "speaks prospectively," as to the parent or parents' ability to remedy the conditions that led to a child's placement in foster care. Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003). And, in termination cases, the trial court retains "'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Toms, 46 Va. App. at 266, 616 S.E.2d at 769 (quoting Farley, 9 Va. App. at 328, 387 S.E.2d at 795). "The phrase, 'within a reasonable time' is not definable by any prescribed rule. Its meaning depends upon the context and the attendant circumstances; not upon mere opinion or expectation." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990) (quoting Virginia Ass'n of Ins. Agents v. Commonwealth, 187 Va. 574, 579, 47 S.E.2d 401, 404 (1948)).

Dr. Lewis testified to a laundry list of services that mother could benefit from. However, at no point did he state that mother could take advantage of services for each of her problems and remedy all of them within a reasonable period of time. A.'s and W.'s drug exposure at birth led to the first removal of all three of the children. The trial court found that mother continued to abuse illegal substances despite the services she received during the first removal in 2007 and 2008. Although the trial court did not make the express finding that the evidence supported Code § 16.1-283(B)(2)(b)'s requirements,[4] we cannot ignore the legislature's recognition of the

---

[4] Code § 16.1-283(B)(2)(b) states:

> Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subdivision B 2 hereof:
>
> \*    \*    \*    \*    \*    \*    \*
>
> The parent or parents have habitually abused or are addicted to intoxicating liquors, narcotics or other dangerous drugs to the extent that proper parental ability has been seriously impaired and the parent, without good cause, has not responded to or followed through with recommended and available treatment

- 26 -

dangers that drug addiction poses to children, as expressed in this statute. Moreover, Dr. Lewis testified that some people with drug abuse problems need to go through counseling four or five times before being able to remain abstinent and that "[t]here's no realistic way of predicting whether a second program would have a different outcome than the first." We have noted that "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood, 10 Va. App. at 540, 394 S.E.2d at 495.

Significantly, the evidence at trial demonstrated mother's pattern of lying to doctors and Department personnel to the children's detriment. Jennifer Mundy testified that when she attempted to persuade mother to tell the doctors about A.'s fall down the stairs, mother stated that father should not have told Mundy about the fall and that the doctors knew enough already. Mother specifically admitted that she did not tell Dr. Scherrer about A.'s fall down the stairs. Jennifer Mitchell also testified that she visited the home after this alleged fall down the stairs but that mother failed to mention it when discussing A.'s medical problems. In terminating mother's rights to all three children, and consistent with the analytical framework of Kaywood, the trial court made a prospective judgment about her ability to remedy the conditions leading to the children's removal. Because evidence in the record supported the trial court's determination, and it was not plainly wrong, we affirm the trial court's judgment on this issue.

D. No error in not ordering additional services or time to remedy offending conditions

In her final assignment of error, mother argues that the trial court erred in not giving her an opportunity to remedy the conditions leading to removal before terminating her parental rights

which could have improved the capacity for adequate parental functioning . . . .

- 27 -

to the three children. On brief, mother also asserts that the trial court erred in not ordering the Department to offer her additional services before making the termination decision.

Because these two arguments raise purely legal questions, we will analyze them under a *de novo* standard. See Mission Residential, LLC v. Triple Net Props., LLC, 275 Va. 157, 161, 654 S.E.2d 888, 890 (2008).

Code § 16.1-283(B)(2) requires a trial court to "take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care" when determining whether the parent can remedy the offending conditions within a reasonable period of time. As we held in Toms, "[n]othing in Code § 16.1-283 or the larger statutory scheme requires that such services be provided in all cases as a prerequisite to termination under subsection B." 46 Va. App. at 268, 616 S.E.2d at 771.

The trial court explicitly stated in each of its final termination orders, "In making this determination, the court takes into consideration the efforts made to rehabilitate the parents by public and private social, medical mental health and other rehabilitative agencies prior to [E., W., and A.'s] initial placement in foster care." It therefore made the requisite finding under Code § 16.1-283(B)(2). In declining to order more services or more time for mother to remedy the conditions, the trial court had ample evidence in the record to rely on, including Ms. Trabosh's testimony as to why the Department did not create a plan for services. Because we see no reason to depart from the plain language of Code § 16.1-283 nor our decision in Toms, we find no error in the trial court's decision not to order additional services for mother prior to termination.

Mother also contends that the trial court should have given her another opportunity to remedy the offending conditions before terminating her rights. But we have stated and continue to recognize that "sometimes, the most reliable way to gauge a person's future actions is to

- 28 -

examine those of his past . . . . [O]ne permissible 'measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child[ren].'" Toms, 46 Va. App. at 267-68, 616 S.E.2d at 770 (quoting Petry v. Petry, 41 Va. App. 782, 793, 589 S.E.2d 458, 463 (2003)). The trial court endorsed the Department's removal of the children for the first time in 2007 while at the same time giving mother and father the opportunity to remedy their substance abuse problems. Despite completing the foster care plan's requirements, mother and father both used marijuana again, and father did not abstain from alcohol. In addition, the trial court found that father inflicted grievous injuries on A. that could have resulted in his death, specifically noting in A.'s final termination order, "The abuse of A. by [father] constitutes 'aggravated circumstances'[5] as defined by . . . Code [§] 16.1-283." Mother not only repeated injurious behavior that she was supposed to remedy after the first removal, but put the children in peril by deciding to leave the children unsupervised with the father. Despite the medical evidence and the trial court's explicit determination that father abused A. in its December 1, 2009 memorandum opinion, mother was still unable to recognize the danger that father posed to the children during the dispositional hearing. Consequently, we find no error in the trial court's decision to terminate mother's parental rights without giving her yet another opportunity to remedy those conditions that led to abuse or neglect of her children. Therefore, we find no error in the trial court's decision based on either of mother's arguments under this assignment of error.

---

[5] Code § 16.1-283 defines "aggravated circumstances" as:

> torture, chronic or severe abuse, or chronic or severe sexual abuse, if the victim of such conduct was a child of the parent or a child with whom the parent resided at the time such conduct occurred, including the failure to protect such a child from such conduct, which conduct or failure to protect: (i) evinces a wanton or depraved indifference to human life, or (ii) has resulted in the death of such a child or in serious bodily injury to such a child.

- 29 -

## IV.  CONCLUSION

For the foregoing reasons, we hold that the trial court did not err in any of the four aspects mother raises.  Therefore, we affirm the judgment of the trial court.

<u>Affirmed.</u>

Petty, J., concurring.

I concur in all but section III.A of the majority's opinion. I decline to join section III.A because I believe it is unnecessary to analyze the trial court's December 1, 2009 findings in this case.

As we observed in father's parallel case, "consistent with the United States Supreme Court's decision in Santosky v. Kramer, 455 U.S. 745, 747-48 (1982), the Department needed to prove each of its allegations supporting termination of parental rights by clear and convincing evidence." Farrell v. Warren Cnty. Dep't of Soc. Servs., __ Va. App. __, __, __ S.E.2d __, __ (Jan. 10, 2012). Accordingly, in father's case, we found that the trial court's findings in its termination decision—as distinct from its prior abused or neglected determination on December 1, 2009—"did indeed indicate that it held the Department to that higher standard; and the Department satisfied that burden." Id. As we further noted, the trial court expressly stated in its final termination orders for E. and W. that it found by clear and convincing evidence that E. and W. were "in danger of death, disfigurement or impairment of bodily or mental functions at the hands of [their] parents by reason of the abuse and neglect of [their] sibling, [A.]." See id. Since this satisfies the definition of an "abused or neglected child" under Code § 16.1-228, this finding is the finding that properly supports the trial court's ultimate decision to terminate mother's residual parental rights. Any prior finding under a lesser burden of proof is consequently irrelevant to an evaluation of the trial court's termination decision. Thus, because mother's first assignment of error concerns such a prior, legally irrelevant finding of the trial court, I would not address it.

- 31 -