UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Kelsey, Beales and Senior Judge Clements

RHIANNON WILLIAMS

                                                    MEMORANDUM OPINION*
v.      Record No. 0598-14-2                        PER CURIAM
                                                    JULY 22, 2014

CHARLOTTESVILLE DEPARTMENT OF SOCIAL SERVICES


            FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
                            Edward L. Hogshire, Judge

            (Michael J. Hallahan, II, on brief), for appellant.

            (Allyson Manson-Davies, Deputy City Attorney; Stephanie Cangin,
            Guardian *ad litem* for the minor child, on brief), for appellee.


       Rhiannon Williams (mother) appeals an order finding that she abused or neglected her child.

Mother argues that the trial court erred by finding that appellant abused or neglected her child

because "the Department's evidence did not rise to the level to prove that the child was abused or

neglected as defined in Virginia Code Section 16.1-228" and "there was no credible evidence to

support the abuse/neglect finding by a preponderance of the evidence." Upon reviewing the record

and briefs of the parties, we conclude that this appeal is without merit. Accordingly, we

summarily affirm the decision of the trial court. See Rule 5A:27.

                                    BACKGROUND

       "On appeal, 'we view the evidence and all reasonable inferences in the light most

favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cnty.

Dep't of Soc. Servs., 59 Va. App. 342, 347, 719 S.E.2d 313, 315 (2012) (quoting Jenkins v.

Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991)).

_____
       * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

On September 19, 2012, Charlotte Getty, the school counselor, called appellant to inform her about a mental health issue regarding appellant's child, Q.W.—specifically that Q.W. threatened to harm herself. Appellant told Getty that she would speak with Q.W., and Getty said that she would check on Q.W. the next day at school. The next morning, appellant left a voice mail message for Getty and informed her that Q.W. was upset and had exaggerated. Appellant said that she cautioned Q.W. about making threats to hurt herself because making such statements was serious. At approximately 10:15 a.m. on September 20, 2012, Getty spoke with Q.W., who again threatened to harm herself. Getty learned that Q.W. had a plan to harm herself and had harmed herself in the past. Getty sent Q.W. back to class and spoke with the principal. Afterward, Getty called appellant and informed her that Q.W. threatened to hurt herself again. Getty told appellant that she needed to come to the school to get Q.W. and take her to Region Ten (a Community Services Board) to be evaluated. Appellant raised her voice and denied that Q.W. had any problems.

Vernon Boch, the principal at Q.W.'s school, contacted appellant. Appellant was "very upset" and yelled. She said that she was not going to take Q.W. to Region Ten for an evaluation. Boch told appellant that she could take Q.W. to her private provider and requested a report from the provider. Appellant continued to yell at Boch and did not respond to the option of taking Q.W. to her private provider. After his telephone call with appellant, Boch called the Department of Social Services (the Department) because he did not think that appellant was taking the threat seriously. The Department advised Boch not to release Q.W. to appellant and sent a Child Protective Services (CPS) worker to the school.

Appellant came to the school. Boch and the school resource officer, Officer Tammy Shiflett, met appellant at the front door. Boch described the situation as follows: "Mom was yelling, foaming at the mouth, demanding that she be able to take her daughter with her, was

using a lot of profanity." Shiflett described appellant as "very loud, . . . very boisterous, very angry." Appellant repeatedly cursed and said that she wanted to take her children and leave. The situation caused a disruption at the school. Eventually, the school released appellant's son to her—but not Q.W. Appellant told Shiflett and the school personnel, "Fine, you all can keep her." Appellant left the school and said that her children were not returning to the school or the school system. Shiflett took Q.W. to the hospital.

Marcus Allen, a CPS investigator, arrived at the school after appellant left. He went to appellant's home to inform her that Q.W. had been taken to the hospital. Appellant told Allen that Q.W. was lying and that it was not necessary to take her to the hospital. Appellant was "very reluctant" to go to the hospital. After discussing the situation for approximately forty-five minutes to one hour, Allen took appellant to the hospital.

When they arrived at the hospital, appellant was calm, but "very frustrated about the whole process." Allen told her that he would check on Q.W. while appellant sat in the waiting room. When Allen saw Q.W., she was "very scared, crying hysterically." Allen told Q.W. that her mother was present. Allen said that Q.W. became "even more scared, even more visibly afraid." Allen went back to the waiting room and told appellant that the medical personnel were still conducting their assessment of Q.W. He also relayed a statement that Q.W. said. Appellant became "very frustrated." Allen started talking to appellant regarding his services and a safety plan. Appellant asked if her son had to be included in the plan, and Allen responded affirmatively. Appellant became "even more frustrated, stood up, [and] yelled" at Allen. She used profanity and told Allen that the Department would not touch her son and that he had nothing to do with the situation with Q.W. As appellant left the waiting room, the doctor appeared to discuss Q.W. Appellant did not stop and speak with the doctor.

- 3 -

Allen spoke briefly with the doctor and called his supervisor. Allen was instructed to find appellant's son and check on him. The Department took custody of Q.W., and another social worker stayed with her. Allen left the hospital to try to locate appellant. He tried to call appellant several times. She answered one time and told him that he was not going to find her or her son. He saw her walking down the sidewalk, toward her home, so he went to her house. The police were also at her house. However, neither appellant nor her son answered the door at the house. They also tried locating them at a relative's house, but did not find them.

At the conclusion of the Department's evidence, appellant made a motion to strike, which the court denied. Appellant testified that she told Getty that she would take Q.W. to her pediatrician and if he determined that Q.W. needed a psychological evaluation, then he could refer her to anywhere but Region Ten. Appellant said that she had "personal experiences" with Region Ten and did not want her daughter to go there. Furthermore, she stated that she was told that she had to take Q.W. to Region Ten and that she was not given any other options. Appellant explained that once she indicated her refusal to take Q.W. to Region Ten, "everything went downhill." Appellant testified that the school told her that they were going to call social services if she did not go to Region Ten. Appellant said that when she arrived at the school, she intended to take her daughter to her pediatrician, but Shiflett had her hand on her holster and refused to allow appellant into the school. Appellant admitted that she got "upset" when she was told that she could not take her daughter. She denied cursing in front of the school. Appellant repeatedly asked for her son, since he was not involved in this situation. Eventually, he came out of school. As appellant was leaving with her son, she said that she told Shiflett that she was taking her son somewhere safe and that she should send the social worker to her house.

When Allen arrived at her house, appellant told him that her daughter had been in trouble earlier and that her daughter's version of events was different than Getty's version. Appellant

- 4 -

testified that she "told everybody," i.e. Allen, Getty, and Boch, that she wanted Q.W. to be evaluated by her pediatrician.

Appellant explained that she left the hospital without seeing Q.W. because she was not allowed to see or talk with her. She said that Allen told her that the Department had custody of Q.W. and was not going to give Q.W. to appellant. Appellant testified that she could hear Allen speaking with his supervisor, who advised him that if appellant did not sign the safety plan, then the Department was "going to take her son."

At the conclusion of all of the evidence, the trial court found that the evidence was sufficient to prove that appellant abused or neglected Q.W. because "she allowed her emotional reaction to what she perceived as an improper intervention by the school system to cloud her judgment." The trial court did not find appellant to be credible, but found the Department's witnesses to be credible. The trial court concluded that appellant's "emotional state . . . severely impaired her judgment, to her disadvantage and to the severe disadvantage of this child." The trial court then heard evidence regarding the foster care plans with goals of return home and relative placement, which were approved. This appeal followed.

ANALYSIS

Appellant argues that the trial court erred in finding that she abused or neglected Q.W. Appellant contends she had intended to take Q.W. to her pediatrician, but that the school refused to allow her to take Q.W. from the school and so appellant never had the opportunity to take Q.W. to the doctor. Then, appellant argues, at the hospital, the Department informed appellant that it had custody of Q.W. and would not allow her to take Q.W. home, so appellant contends she did not abandon Q.W. at the hospital. Lastly, appellant asserts that the child's condition "wasn't that big of an emergency" because the school sent her home on September 19, 2012 and did not demand that she go to the hospital until the next day. She argues that since she never had

the opportunity to take the child to seek medical attention, there was no substantial risk of harm or actual harm.

"Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986) (citations omitted).

Pursuant to Code § 16.1-228, an "'[a]bused or neglected child' means any child . . . [w]hose parents or other person responsible for his care neglects or refuses to provide care necessary for his health . . . [or] [w]hose parents or other person responsible for his care abandons such child . . . ."

The evidence proved that Q.W. had threatened to harm herself. She had a plan to do so and had done so in the past. When the school asked appellant to get Q.W. evaluated, appellant refused. She became belligerent and uncooperative with the school and with the Department. She ultimately left the school and told the school officials that they could "keep" Q.W. At the hospital, appellant again became irate and left her daughter at the hospital—after walking out of the hospital without even talking with her daughter's doctor, who had came to the waiting room to talk with appellant.

Appellant presented a different explanation for what happened. The trial court had the opportunity to see and hear the witnesses. It asked appellant whether all of the Department's witnesses were lying, and she responded, "They are." The trial court concluded, "I haven't heard any sustainable basis to find that the entire group of professionals that are here are lying, for some reason, about what happened." The trial court, however, indicated that appellant's behavior affected the trial court's "perspective on her credibility."

"It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony." Street v. Street, 25 Va. App. 380, 387, 488 S.E.2d 665, 668 (1997) (*en banc*) (citation omitted).

The record shows that the Department proved by a preponderance of the evidence that appellant refused to seek the appropriate medical care for Q.W. Appellant continually denied that Q.W. had any mental health issues, despite the fact that Q.W. had expressed an intent to harm herself and had a plan to do so. Then, appellant essentially abandoned Q.W. when she left her at the hospital and would not even talk with Q.W.'s doctor there. Accordingly, the trial court did not err in making a finding that appellant abused or neglected her child.

CONCLUSION

For the foregoing reasons, the trial court's ruling is summarily affirmed. Rule 5A:27.

Affirmed.