COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Ortiz and Causey
Argued at Fairfax, Virginia


ORAYL DALE VONTE INGRAM

                                                    MEMORANDUM OPINION* BY
v.          Record No. 1289-20-4          JUDGE DORIS HENDERSON CAUSEY
                                                    MAY 10, 2022

FAIRFAX COUNTY DEPARTMENT
 OF FAMILY SERVICES


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Brett A. Kassabian, Judge

        Donna L. Biderman for appellant.

        Deborah C. Laird, Assistant County Attorney (Kathleen Rust Bell,
        Guardian *ad litem* for the minor children, on brief), for appellee.


        Orayl Dale Vonte Ingram ("father") appeals the termination of his parental rights to his

two minor children, M.I. and L.I. ("children").[1]  Father contends that the circuit court committed

reversible error in finding, pursuant to Code § 16.1-283(C)(2), that father, without good cause,

failed to substantially remedy the conditions that led to the placement of the children in foster

care.  For the reasons set forth below, we affirm the circuit court's decision.


---

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] The biological mother's parental rights to the children were previously terminated.  Any
challenge to the termination of mother's parental rights is not a part of this appeal.

I. BACKGROUND[2]

The children who are the subjects of this appeal are M.I. and L.I. Lauren Jones ("mother") is the mother of four daughters: S.J., E.W., M.I., and L.I. In May 2019, around the time that M.I. and L.I. entered foster care, the four daughters were eight years old, seven years old, three years old, and one year old, respectively. Father is the biological father of M.I. and L.I.

In November 2017, father and mother were charged in federal court for interstate transportation during prostitution, use of interstate facilities involving prostitution offenses, and aiding and abetting prostitution. In January 2019, father pled guilty to interstate transportation for prostitution and aiding and abetting prostitution. Both parents were sentenced collectively to forty-five months of incarceration and decided to split the time served to allow one parent to be home with the children. Father began serving a thirty-month prison sentence in March 2019.

Previously, in November 2016 and March 2018, the State of Maryland filed child neglect reports regarding M.I. One report alleged that mother and father brought M.I., then one year old, to a hotel where mother was prostituting. Another report alleged that mother and father were also taking M.I., while she was two years old, with them to "dates" and/or being with M.I. in a hotel room nearby while they engaged in prostitution. Additionally, when mother was arrested during an undercover prostitution operation in a hotel room, father and the children were down at the hotel pool.

_____

[2] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues father has raised. Evidence and factual findings below that are necessary to address the assignment of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

In April 2019, the Jones-Ingram family was referred to Child Protective Services ("CPS") in Annandale due to allegations of physical neglect and inadequate supervision—it was reported that S.J., then eight years old, was watching one-year-old L.I. at night so that mother could work.[3] At the time, M.I. and L.I. lived at their maternal grandfather's home in Falls Church, Virginia, with their maternal grandfather, maternal uncle, mother, and two older sisters; father was incarcerated at a federal facility in Pennsylvania. The family entered into a safety plan. Additionally, shortly after, based on allegations that mother physically abused S.J. and E.W., the Jones-Ingram family was referred to CPS again. After investigating these allegations, the Fairfax County Department of Family Services ("DFS") sought removal of all four children because the first neglect allegation in Virginia was still being investigated and "the family has extensive history in Maryland that included foster care twice and six substantiated findings of neglect for the children." The Fairfax County Juvenile and Domestic Relations District Court ("JDR court") entered emergency removal orders regarding the children on May 14, 2019. In June of 2019, DFS identified Robin Ingram ("paternal grandmother")[4] as a possible relative placement option.

Elizabeth Carter ("Ms. Carter"), a foster care specialist with DFS, was the foster care worker assigned to the Jones-Ingram family starting in May 2019. By July 10, 2019, Ms. Carter had no contact with father. To contact father, Ms. Carter was required to coordinate with

---

[3] Mother worked the night shift at a restaurant.

[4] The record also refers to paternal grandmother as "Robin Moore."

father's case manager at the prison.[5]  Ms. Carter left many voicemails as well as emails for his case manager, but they went unanswered.  By the foster care review hearing on October 30, 2019, father had never contacted Ms. Carter, "[i]t was always [Ms. Carter] contacting [father]."

In the foster care plan entered at disposition, Ms. Carter included several services for father to complete:  a referral for a psychological evaluation, a referral for a parent capacity assessment—one for each child, a parenting class, supervised visitation, and case consultation. Father was to file any treatment recommendations from those referrals and reports.  Ms. Carter explained that she included these services for father "in case he was released prior to his good behavior date of March of 2021" and that she "wanted to encourage him to take advantage of these services that were offered in his facility" so he could make progress before his potential early release.  She explained that "[t]hese are assessments that we ask all parents to participate in before we can consider them as [a] placement option for the children."

Ms. Carter had multiple contacts with father while he was in prison in Pennsylvania: (1) a phone call on October 10, 2019; (2) a phone call on January 22, 2020; (3) an in-person meeting on February 7, 2020; (4) a phone call on March 27, 2020[6]; and (5) a phone call on August 11, 2020.  For the in-person meeting on February 7, 2020, Ms. Carter traveled for four hours from Fairfax to the federal prison in Loretto, Pennsylvania, to meet with father.

Over the course of these contacts, Ms. Carter explained to father DFS's assessment of his children's situation and what would be required of him.  She explained that for father to be

---

[5] In order to speak with father, Ms. Carter was required to contact father's case manager by phone or email, stating that she was requesting contact with father.  Ms. Carter would then be given a date and time for the contact to take place, after which she would compose a letter confirming the date and time, with father's registration number attached to the letter.  Ms. Carter testified that for every phone call she had with father, she had to send a letter confirming her request.  Ms. Carter wrote letters to father's case manager requesting meetings with father on October 25, 2019, October 30, 2019, November 1, 2019, and February 7, 2020.

[6] This phone call was the first time that father contacted Ms. Carter on his own.

considered a placement option, she would need him to participate in the relevant classes offered at the facility. She explained that she had tried to arrange for outside providers to come to the facility to provide services—such as the psychological evaluation, the parent capacity assessment, and parenting classes—and that she was informed by the case manager that outside providers were not permitted because the facility offered those services. Father confirmed that parenting classes were offered at the facility, but that there was a long waitlist for the class. Ms. Carter encouraged father to sign up for the class as soon as possible and to also put his name on the waitlist. When Ms. Carter followed up, father said he forgot to put his name on the waitlist, did not do so until December 2019, and, due to the long waitlist, could not take the class until April 2020. The class was later canceled due to the COVID-19 pandemic. Regarding the psychological evaluation, father told Ms. Carter that he had previously completed a psychological evaluation and did not want to complete another. Consequently, Ms. Carter requested that father sign a release so she could obtain a copy of the evaluation, but father never did so. Ms. Carter also asked father to complete an Alcohol and Drug Services ("ADS") evaluation, but father did not do so, commenting that he does not drink or do drugs. DFS required supervised visitation with the home-based counselor to ensure that father's communication and parenting capacity was appropriate for the girls. Additionally, father needed to complete a sexual risk assessment because, at the time, there was an open CPS investigation based on an allegation that father sexually abused his stepdaughter, S.J.

During these meetings, father showed little interest in reviewing the court-entered permanency plans regarding his children. He denied ever neglecting his children and refused to acknowledge that bringing his children along with him and mother while they conducted criminal activities was neglectful behavior. Father "kept stating that he was the mastermind" behind the prostitution ring, and, when asked, stated that he would do the whole thing all over

again. Father admitted to having sex with a thirteen-year-old girl when he was seventeen, and Ms. Carter noted that father did not seem to think such action was problematic.

Regarding his plans for the care of the children, father communicated that he thought mother was a good parent and wanted his children to be returned to her custody. If they could not be returned to her custody, however, he wanted them to remain in foster care until he was released from prison and could improve himself as a placement option. Father informed Ms. Carter that his release date was September 30, 2020. The only residential option for father upon release was a halfway house, which did not allow children. To support the children financially, father stated his plan was to file a claim to obtain money owed to him by the IRS and potentially become a property manager, like he had done prior to being incarcerated, or work at the new Amazon facility. Father noted that while incarcerated, he had been studying to be a physical trainer so he could take the test for certification upon his release. Regarding childcare, father stated that he hoped his father-in-law would change his mind about letting father live with him. Otherwise, father was not able to come up with a solution for childcare but thought that maybe he could get a job that allowed him to work from home so he could supervise the children.

On March 6, 2020, the JDR court terminated father's parental rights to M.I. and L.I. About six months later, the circuit court heard father's appeal of that order. By the time of the appeal, the children had been in foster care for seventeen months. Father testified that he had phone contact with the children starting in April 2020 and that his new release date was March 25, 2021. He reiterated that his plan for taking care of the children was for him to stay with paternal grandmother, and then, after "get[ting] [him]self together," the children could live with him in about four to six months. Ms. Carter testified that paternal grandmother planned to adopt all four of mother's daughters so that the sisters are able to grow up together. Ms. Carter detailed

the children's lives since living with Ms. Ingram—the girls are happy, doing well, and enjoy being with their other sisters. A home study of Ms. Ingram's home indicated it is a "safe, permanent home." Ms. Ingram is able to provide for the children's needs and even beyond their needs, "engag[ing the children] in extracurricular activities over the summer."

On November 6, 2020, the circuit court terminated father's parental rights to M.I. and L.I., pursuant to Code § 16.1-283(C)(2). This appeal follows.

## II. ANALYSIS[7]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court," in this case, DFS. *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)). When reviewing a trial court's decision to terminate parental rights, we presume the trial court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." *Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 7 (2005) (quoting *Farley v. Farley*, 9 Va. App. 326, 329 (1990)). "It is critical to understand that regardless of what subsection of Code § 16.1-283 [DFS] proceeds under, it must prove each of its allegations by clear and convincing evidence before the . . . court may terminate a parent's parental rights to his or her child." *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 342, 347 (2012). The circuit court's finding, "when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991). "Where the record contains credible

---

[7] Father did not timely file a transcript or statement of facts. We proceed to the merits of the case, however, because at oral argument, appellee indicated that it did not object to father's late submission of the transcript. *See Smith v. Commonwealth*, 281 Va. 464, 470 (2011) (["T]he failure to timely file the transcript . . . [does] not deprive the Court of Appeals of its active jurisdiction to proceed to judgment in the appeal.").

evidence in support of the findings made by that court, we may not retry the facts or substitute our view of the facts for those of the trial court." *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 336 (1992).

Father contends that the circuit court erred in terminating his parental rights for several reasons. First, he maintains that the circuit court erred in finding that termination of his parental rights was in the children's best interests. In support of this argument, father posits that he "loved his children, . . . no evidence was presented that [he] would harm his children[,] . . . the only abuse and neglect of the children was at the hands of the mother," and "he has maintained a [paternal] interest in his children throughout their lives." Second, he argues that he did not, without good cause, fail to substantially remedy the conditions that led to the children's placement or continued placement in foster care. He contends that his "incarceration and COVID pandemic caused his failure to remedy [such conditions], not his intent to no[t] comply." Father asserts that "[t]hough [he] has needed more time than the twelve months allowed by statute to provide stability for the girls, he . . . has become serious about securing a home and future for himself and his children." Father argues that the facts here are analogous to the facts in *Roanoke City Department of Social Services v. Heide*, 35 Va. App. 328 (2001), and, as in *Heide*, his parental rights should not be terminated.

Code § 16.1-283(C)(2) authorizes a court to terminate parental rights if the court finds by clear and convincing evidence that (1) the termination is in the best interest of the child and (2) the parent was unwilling or unable to substantially remedy the conditions that led to or required continuation of the child's foster care placement.

In analyzing the first prong, the circuit court must consider:

> the age and physical and mental condition of the child; the age and physical and mental condition of the parent; the relationship existing between the parent and the child; the needs of the child; the role the parent has played, and will play in the future, in the

upbringing and care of the child; and any other such factors that
are necessary.

*Thach*, 63 Va. App. at 169.

A parent's "record of neglect with regard to [his other] children is relevant to [his] ability to care properly for [the child/children at issue]." *Logan*, 13 Va. App. at 132 (noting testimony about how "the Department was involved with [the parent] in the past when she failed to enroll her other two children in school" was relevant to whether it was in the child's best interest for the court to terminate the parent's parental rights). "Virginia law recognizes the 'maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past.'" *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 267-68 (2005) (quoting *Petry v. Petry*, 41 Va. App. 782, 793 (2003)). Additionally, "we have long held that '[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities.'" *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 162 (2004) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)).

> While we have held that "long-term incarceration does not, *per se*, authorize termination of parental rights," we have recognized that "it is a valid and proper circumstance which, when combined with other evidence concerning the parent/child relationship, can support a court's finding by clear and convincing evidence that the best interests of the child will be served by termination."

*Id.* (quoting *Ferguson v. Stafford DSS*, 14 Va. App. 333, 340 (1992)). In *Harrison*, in affirming the circuit court's termination of parental rights, we noted that there was "no basis for requiring the trial court to place more credibility in [the parent's] proposed plans for the future than was warranted by his past actions," where the parent engaged in criminal activity—selling and allowing minors to use drugs in his home—while the child at issue "was in his custody and care." *Id.*

- 9 -

Here, clear and convincing evidence supports a finding that it was in the children's best interests to terminate father's parental rights to the children. Father has a record of neglect regarding the children at issue. Neglect reports from Maryland note that father and mother brought both children with them while the parents engaged in criminal activity, potentially exposing the children to danger. Additionally, there was an open investigation into allegations that father sexually abused the children's half-sister. The trial court had the authority to infer that these past instances of neglect affected father's present ability to care for M.I. and L.I. Additionally, as in *Harrison*, the trial court was not required to credit father's proposed plans for his future care of his children, where father engaged in criminal activity while the children were in his custody.

L.I. and M.I. are doing well living with Ms. Ingram. Ms. Ingram is willing to adopt all four siblings so that they can stay together, as the sisters are very close. It is clearly in the best interests of L.I. and M.I. to live in such an environment; one that is safe, stable, and where they are happy. Accordingly, the trial court did not err when it found that termination of father's parental rights was in the best interests of the children.

If the court determines by clear and convincing evidence that termination is in the children's best interests, the circuit court then moves to the second prong. *Thach*, 63 Va. App. at 170.

Under the second prong, the court must find clear and convincing evidence that:

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or *required continuation* of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2) (emphasis added); *see also Thach*, 63 Va. App. at 170.

We have held that "it would be patently unreasonable" to require DFS to offer services to parents while they are incarcerated. *Harrison*, 42 Va. App. at 163-64. *But see Cain v. Commonwealth ex rel. Dep't of Soc. Servs. for City of Roanoke*, 12 Va. App. 42, 45-46 (1991) (reversing termination of parental rights where DSS did not provide services to mother while she was incarcerated pending trial).

Here, father was incarcerated when the children were removed and was incarcerated throughout the life of this case—he appeared at each hearing, including the termination of parental rights hearing, via the internet from prison. While under *Harrison*, DFS has no burden to offer services to an incarcerated parent, even if *Cain* required such, DFS has met its burden here. Ms. Carter, at great effort, contacted father multiple times—and even traveled four hours (one way) to meet with him in person—to discuss the case and the services he needed to complete to be considered a viable placement option. Ms. Carter inquired whether outside service providers could be sent to the prison but was informed that the relevant services were offered at the prison. Although the COVID-19 outbreak affected the availability of the parenting class at the prison, father waited to put his name on the waitlist for the class, contributing to the eventual result that father was unable to take the class and indicating that father did not consider the class a priority.

Additionally, DFS either needed access to or needed to perform different evaluations of father. However, father did not sign a release to give Ms. Carter access to his psychological assessment and would not complete an ADS assessment. Ms. Carter noted that father seemed uninterested in the status of the case. She noted father's statement that, if given the chance, he would engage in the prostitution ring all over again—even though the criminal activity exposed his children to potential danger and ultimately led to his incarceration, making him unable to care for his children. Father correctly notes that the recent neglect accusations against mother are

- 11 -

what initially prompted DFS to get involved with the Jones-Ingram family. However, father's failure to comply with service requirements or recognize the effect his criminal activity has had on his children and parenting capacity support the trial court's finding that father failed to remedy substantially the conditions which *required continuation* of the children's foster care placement.

Father's argument that "DFS did not show by clear and convincing evidence that Mr. Ingram has failed to remedy his situation 'without good cause'" because his "incarceration and COVID pandemic caused his failure to remedy [the conditions which led to or required continuation of the child's foster care placement], not his intent to no[t] comply" is without merit. A parent cannot "use [his] incarceration as reason to . . . say that [his] failure to remedy the conditions [that led to the children's foster care placement] was without good cause." *Harris v. Lynchburg Div. of Soc. Servs.*, 223 Va. 235, 242 (1982). Additionally, although the COVID-19 pandemic did affect the availability of some services, the incompleteness of other services was a result of father's unwillingness to comply or seeming lack of interest in completing the services.

Father's reliance on *Heide* is misplaced. He cites *Heide* for the proposition that "failure to remedy the situation within the twelve[-]month period contemplated in the statute is not an absolute bar to the parent recovering custody of his child. Where it serves the child's best interest, the court may consider actions taken by the parent after the twelve-month period." However, the facts here are not analogous to those in *Heide*. In *Heide*, the trial court denied the petition to terminate the father's parental rights because, in the months between the JDR termination of parental rights hearing and circuit court appeal, father *had* "pulled himself up" and "*completed* substance abuse treatment and *maintained* steady employment." *Heide*, 35

Va. App. at 330, 335 (emphasis added). The father in *Heide* had demonstrated change in his circumstances, not merely made promises of future change. Here, father has only done the latter.

## III. CONCLUSION

Because terminating father's parental rights to M.I. and L.I. was in the children's best interest, and father failed to substantially remedy the conditions that led to the children's placement or continued placement in foster care, the trial court did not err.

*Affirmed*.