COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges AtLee, Causey and Senior Judge Haley
Argued at Richmond, Virginia


NATASHA V. COMER

v.      Record No. 0999-21-2

MEMORANDUM OPINION* BY
JUDGE DORIS HENDERSON CAUSEY
AUGUST 9, 2022

HENRICO COUNTY DEPARTMENT
 OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF HENRICO COUNTY
John Marshall, Judge

Lisa Way Piper (Family Law Associates of Richmond, on brief), for
appellant.

Karen E. Dottore, Assistant County Attorney (Alexander M. Clarke,
Jr., Guardian *ad litem* for the minor children; The Clarke Law Firm,
PLLC, on brief), for appellee.


Natasha Comer ("mother") appeals the termination of her parental rights, under Code

§ 16.1-283(C)(2), to her three children.  Mother contends that the circuit court erred in

(1) finding clear and convincing evidence that she, without good cause, failed to substantially

remedy the conditions that led to the children's placement in foster care and (2) failing to

consider "the lack of timely identification of necessary services [by DSS] prior to the removal of

the children."

For the reasons below, we affirm.

## I. BACKGROUND

Mother and Harold Jerry ("father") are the biological parents to D.C., L.C., and Z.C.

("the children"), born September 14, 2006, February 14, 2008, and May 14, 2009, respectively.

_____

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

In March 2018, the Henrico County Department of Social Services ("DSS") assigned Kim Wilson McRae, a senior family services specialist, to work with the Comer family. She was assigned to work with the family by a court order to provide "prevention services" to the family, which are "assessment services initiated by the Court to determine family service needs and to coordinate resources and to prevent foster care placement." At the time, the Comers' home was in foreclosure and had no running water, and the family had no income or means of transportation. The Department discovered that mother "had been keeping [the children] home in order to protect them as she believed outside forces were attempting to hurt her family." For example, mother thought that "the government and [the] principal [were] doing surveillance of her home and conspiring against her and are a part of a group to possibly abduct her children." Mother also thought that "[P]resident Obama was spying on her and out to get her family." Mother's mental health contributed to her unemployment, as she believed people at work were "harassing her" and "generally out to get her." In August 2018, the house did not have electricity.

McRae "work[ed] on trying to figure out the [water] situation [and] possible housing plans," took mother to food banks and grocery shopping, provided transportation to mother and the children, referred mother to Henrico Mental Health, helped mother complete a Medicaid application, and arranged a family planning meeting. McRae testified that "the biggest barrier to the family achieving stability" was "trying to figure out what [mother's mental health challenges] were and how to assist her with them." Tony Jones, a senior family service specialist with DSS, also provided services to the Comer family, including visiting the Comer home three times in October, purchasing water three times, providing food vouchers, and providing transportation. He noted that "community providers" were helping with the lack of electricity in the home.

In November 2018, DSS removed the children from mother and placed the children in foster care. At the time of removal, the children resided with mother. Father was incarcerated when the children entered foster care and for most of the case until his release at the beginning of 2021. Mother underwent mental health evaluations, which diagnosed her with schizophrenia and noted "the importance of [mother] following treatment recommendations." The evaluations showed that mother was in denial of her symptoms, but that she could be successful if she followed recommendations.

Originally, the Henrico County Juvenile and Domestic Relations District ("JDR") Court approved a foster care plan with the goal of return home. In June 2019, DSS filed foster care plans with the goal of adoption. The court rejected the goal of adoption and continued the matter to September 2019. In September 2019, the court approved the permanency planning goal of return home. In June 2021, however, the court entered orders changing this goal to adoption, the main reason for the goal change being "mother's mental health" and concern about her "being able to meet the boys' needs long term." The JDR court also entered orders terminating mother's and father's parental rights to the children, which both parents appealed. The Henrico County Circuit Court ("circuit court") heard the appeals on August 31, 2021.

Jim Carey, a foster care supervisor in Henrico County, had been assigned to the Comer case since the children were placed in foster care. Carey testified that "the biggest barrier" to mother remedying the situation that led to the children's foster care placement was "[mother's] mental health needs." "[O]ver the life of the case," mother was "very inconsistent" with her medication. Carey testified that the "therapists and the people who were working with [mother] felt" that mother taking her prescribed medication would help mother "meet her kids' needs." He testified that DSS' primary concern at the time of removal in November 2018 was mother's mental health and they felt that a lot of the other concerns—the lack of electricity, lack of water,

threat of foreclosure—were related to mother's mental health. He confirmed that at the time of the hearing, the housing, water, and electricity issues had been remedied. Even so, DSS was still concerned about mother's mental health and mother "not following through with the recommendations of the people who are trying to treat her."

Dr. Moritz, a licensed clinical psychologist, was qualified to testify as an expert in parenting and psychological evaluations. Dr. Moritz evaluated mother in October 2019 and diagnosed mother with schizophrenia. Dr. Moritz testified that schizophrenia is usually an incurable condition. She testified that compliance with the recommended medication regimen was important. In January 2019, the court ordered mother to comply with all mental health treatment recommendations.

Dr. Nelson, a licensed clinical psychologist, was qualified to testify as an expert in parenting and psychological evaluations. She also diagnosed mother with schizophrenia and testified that, to her knowledge, it is not a curable disorder. When Dr. Nelson evaluated mother in March 2020, Dr. Nelson noted that mother "was quite well[-]managed" and that "there were no obvious issues with paranoia." Dr. Nelson noted that at the time of the evaluation, mother was compliant with her prescribed medications. Dr. Nelson recommended that mother "compl[y] with [her] medication."

Mirjam Bryan, a physician assistant working in psychiatry, worked with mother to treat mother's schizophrenia with medication from February 2019 until mother's case was closed in August 2021. Bryan first prescribed mother Seroquel, an antipsychotic, but mother complained of side effects such as sedation and drowsiness. Bryan then prescribed Abilify, which was supposed to reduce the side effects of which mother complained. Although Bryan noted that there were periods when mother would be "compliant, . . . there were periods where she was noncompliant." In the spring and summer of 2020, mother had, on her own, stopped taking her

medication. In September 2020, however, some of mother's schizophrenic symptoms had returned. This same month, the court again ordered mother to be medication compliant.

Anya Horning, a senior family services specialist in the foster care unit at DSS, was assigned to the Comer-Jerry case in March 2021. She testified that in April 2021, she had concerns about mother's mental health because she knew mother "was not actively participating in the recommended medication management," and "in the contact that [Horning] had with [mother], [Horning] saw evidence that [mother] was beginning [to] or was having paranoid thoughts[.]" Horning noted that statements mother was making about paranoid delusions were similar to statements she was making "when she . . . lost her job and the [children] were removed."

The circuit court entered permanency planning orders approving the goal of adoption and orders upholding the termination of mother's and father's parental rights to the children. This appeal follows.

## II. ANALYSIS[1]

### Standard of Review

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court," in this case, DSS. *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)). When reviewing a trial court's decision to terminate parental rights, we presume the trial court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the

---

[1] Mother also challenges the circuit court's order approving the foster care plan's goal of adoption. "Our decision to affirm the termination order necessarily subsumes this aspect of his appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans." *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 265 n.3 (2005).

child's best interests." *Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 7 (2005) (quoting *Farley v. Farley*, 9 Va. App. 326, 329 (1990)). "It is critical to understand that regardless of what subsection of Code § 16.1-283 [DSS] proceeds under, it must prove each of its allegations by clear and convincing evidence before the . . . court may terminate a parent's parental rights to his or her child." *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 342, 347 (2012). The circuit court's finding, "when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991). "Where the record contains credible evidence in support of the findings made by that court, we may not retry the facts or substitute our view of the facts for those of the trial court." *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 336 (1992).

<u>Failure to Remedy Conditions</u>

Mother contends that she had good cause for not substantially remedying, within twelve months, the condition that brought the children into foster care. She asserts that she "had resolved the primary issues that brought the children into care: housing stability, employment, school attendance, utilities, transportation" and had engaged in services to address her mental health needs. She notes that despite her schizophrenia diagnosis, she "scored high [on the parenting evaluation] in ability to problem solve as a parent, cared for her children," and her symptoms were deemed "well managed" at the time of the parenting evaluation. Thus, mother argues that the "possibility" for her to manage her schizophrenia when services are in place is good cause for allowing mother longer than twelve months to substantially remedy the conditions leading to the children's placement in foster care.

Code § 16.1-283(C)(2) authorizes a court to terminate parental rights if the court finds by clear and convincing evidence that (1) the termination is in the best interest of the child and

(2) the parent was unwilling or unable to substantially remedy the conditions that led to or required continuation of the child's foster care placement.

Mother does not contest that terminating her parental rights was in the children's best interest; thus, we move to the second prong. *Thach*, 63 Va. App. at 170. Under the second prong, the court must find clear and convincing evidence that:

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2); *see also Thach*, 63 Va. App. at 170.

"[A] parent's mental deficiency that is of such severity that there is no reasonable expectation that such parent will be able within a reasonable period of time befitting the child's best interests to undertake responsibility for the care needed by the child . . . does not constitute 'good cause' under Code § 16.1-283(C)(2)." *Richmond Dep't of Soc. Servs. v. L.P.*, 35 Va. App. 573, 585 (2001). This Court has upheld termination of parental rights, where such termination was based, in part, on a parent's "poor management of her mental illness," where the parent was diagnosed with paranoid schizophrenia, was court ordered to take her medication related to this illness, and did not reliably take her medicine. *See Wright v. Alexandria Div. of Soc. Servs.*, 16 Va. App. 821, 824, 828-29 (1993) (concluding that, under Code § 16.1-283(B) and (C), "the conditions leading to [the child's] placement in foster care could not be substantially corrected or eliminated within a reasonable period of time"); *see also Helen W. v. Fairfax Cnty. Dep't of Hum. Dev.*, 12 Va. App. 877, 881, 884-85 (1991) (upholding trial court's finding that, under Code § 16.1-283(C), parents were unwilling and unable to substantially remedy the conditions

- 7 -

leading to the child's foster care placement, where one parent was diagnosed with paranoid schizophrenia and "refused to participate in recommended mental treatment").

Here, mother's diagnosis of schizophrenia is a mental deficiency of such severity that there is no reasonable expectation that mother will undertake responsibility for the care needed by the children, especially when mother is not medication compliant regarding her mental health. Throughout the case, DSS' primary concern was mother's mental health. DSS stated it believed mother's schizophrenia contributed to her letting the house go into foreclosure and failing to keep running water and electricity in the house. While Dr. Nelson testified that mother did, at one point, appear to be managing her symptoms, several healthcare professionals testified that mother should take medication to manage her schizophrenia. Mother refused to do so consistently. Additionally, during a period when mother was noncompliant with her medication, she began to have paranoid delusions again, the same type she had at the time of removal. Under these circumstances, there is no reasonable expectation that mother could care for the children in a reasonable amount of time. Accordingly, the trial court did not err in finding that mother failed to substantially remedy the conditions that led to the children's placement in foster care and that she was without good cause to do so.

Provision of Services Before Entry into Foster Care

Mother argues that "the court failed to take [into] consideration the prior efforts of [DSS] or other rehabilitative services, . . . specifically the lack of timely identification of . . . services" before the children's removal.

In terminating parental rights, Code § 16.1-283(C)(2) requires the court to "take into consideration the prior efforts of [social, medical, mental health or other rehabilitative] agencies to rehabilitate the parent or parents prior to the placement of the child in foster care."

When reviewing a trial court's decision to terminate parental rights, we presume the trial court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." *Fields*, 46 Va. App. at 7 (quoting *Farley*, 9 Va. App. at 329).

Here, first, mother misstates the facts. DSS began providing services to mother in March 2018 before the children were removed, about eight months later, in November 2018. The circuit court heard evidence that during this period, DSS sent workers to check in with the family, purchased water, searched for housing, provided transportation, took mother grocery shopping, provided food vouchers, helped mother complete a Medicaid application, referred mother to mental health services, inquired into restoring electricity, and arranged a family planning meeting.

Second, to the extent that mother argues the trial court erred in failing to consider evidence that DSS did not timely provide services to the family both before and after the children entered foster care, this argument also lacks merit. Mother points to places in the transcript where she raised examples of DSS' failure to timely provide services, such as the delay in scheduling a mental health evaluation for mother and the stopping of mother's therapy sessions. Mother argues that "[t]he [c]ircuit [c]ourt gives no indication in [its] ruling that this factor was taken into consideration, despite evidence and argument specifically directing [its] attention to that issue." We presume, however, that the trial court considered this evidence in making its ruling. Thus, we cannot say that the trial court erred in the manner mother alleges.

### III. CONCLUSION

Because (1) mother failed to substantially remedy the conditions that led to the children's placement and (2) the circuit court heard evidence of DSS' efforts to rehabilitate mother before

placing the children in foster care, the trial court did not err in terminating mother's parental rights.

*Affirmed.*