COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Decker, Judge AtLee and Senior Judge Haley
Argued by videoconference


TIMOTHY ALAN REDMAN

v.      Record No. 0098-23-3

ROANOKE CITY DEPARTMENT OF
  SOCIAL SERVICES                           MEMORANDUM OPINION* BY
                                        CHIEF JUDGE MARLA GRAFF DECKER
TRACY LYNN CLINE                                  MAY 14, 2024

v.      Record No. 0156-23-3

ROANOKE CITY DEPARTMENT OF
  SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Onzlee Ware, Judge

David A. Bowers for appellant Timothy Alan Redman.

John S. Koehler (Ruth Blaskis; The Law Office of James Steele,
PLLC; The Law Office of Ruth Blaskis, on briefs), for appellant
Tracy Lynn Cline.

Jennifer L. Crook, Assistant City Attorney (Timothy R. Spencer,
City Attorney; James P. Cargill, Guardian ad litem for the minor
child; James P. Cargill, P.C., on briefs), for appellee.


Timothy Alan Redman (the father)[1] and Tracy Lynn Cline (the mother) appeal the circuit

court's dispositional order removing their child, placing him in the custody of the Roanoke City

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The father filed a motion advising this Court that the pleadings in the proceedings below incorrectly list his middle name as "Allen."  He requests, without objection, that this Court correct the spelling of his middle name as used in the style of his appeal to "Alan."  We remand to the circuit court to correct the style of the case to reflect the correct spelling of the father's middle name.  Further, in this Court, we hereafter identify him as Timothy Alan Redman.

Department of Social Services (the department), and approving the department's foster care plan with the primary goal of relative placement and the concurrent goal of adoption.[2] The parents contend that the circuit court erred by concluding that the child had been abused or neglected and was subject to an imminent risk of harm. They also challenge the court's rulings that the department made reasonable efforts to prevent the removal of the child and that no less drastic alternatives to removal were available. Finally, they argue that it erroneously concluded the goals of relative placement and adoption were appropriate. We disagree with the appellants and affirm the judgment of the circuit court.[3]

---

[2] Although the father and mother appeal separately, their appeals involve common facts, proceedings, and issues of law. Consequently, this Court consolidates the appeals for purposes of our decision. *See Bennett v. Commonwealth*, 8 Va. App. 228, 229 n.1 (1989).

[3] After the parents noted the instant appeals to this Court, the circuit court entered an order terminating their parental rights, and both parents have noted appeals of the termination ruling. *See Redman v. Roanoke City Dep't of Soc. Servs.*, No. 1913-23-3 (Va. Ct. App.); *Cline v. Roanoke City Dep't of Soc. Servs.*, No. 1963-23-3 (Va. Ct. App.). The mother suggests that her instant appeal might have become moot due solely to the circuit court's termination ruling. Following supplemental briefing as ordered by the Court, we hold that the instant appeals are not moot. It is true that "a termination decision, *if final and unappealed*, moots any justiciable contest over a prior decision to approve DSS's foster care plan recommendations." *Najera v. Chesapeake Div. of Soc. Servs.*, 48 Va. App. 237, 241 (2006) (emphasis added). Here, though, both parents have appealed the termination ruling, and those appeals have not yet been conclusively resolved by an unappealed final order. As a result, we hold that the instant appeals are not moot. Also, because we affirm, we need not consider the impact that reversing these appeals, while the termination appeals are still pending, would have on the custody of the child. *See generally Castillo v. Loudoun Cnty. Dep't of Family Servs.*, 68 Va. App. 547, 560 (2018) (explaining that appellate courts decide cases on the best and narrowest ground available).

BACKGROUND[4]

The mother and father are the biological parents of the minor child who is the subject of this appeal.[5]  The child has been diagnosed with Down syndrome, autism, and attention deficit hyperactivity disorder, and he is predominantly nonverbal.  The department first became involved with the family in 2011, while the father was incarcerated, because of concerns about the mother's mental health and alcohol use and the fact that the then-three-year-old child had been physically abused.[6]  The department provided the mother with services, including in-home services, mental health support, and counseling, with which the mother "minimal[ly] compli[ed]."  The child entered foster care for the first time in mid-2013 because the mother appeared to be "in a constant state of crisis" and "overwhelmed with caring for" him.  The mother regained custody of the child about five months later, in early 2014.

The department became involved with the family again about three years later, in March 2017, after it received a report alleging that the mother's longtime boyfriend had abused the child, who was nine at the time.  During the investigation, "strangulation marks" were observed on the child's neck.  The department made a disposition of "founded" for level-two physical abuse against the mother's boyfriend.  The department advised her that he could not have contact with the child without its approval.  In August of that same year, while the father was incarcerated, the child

---

[4] On appeal, "we view the evidence in the light most favorable to the prevailing party, in this case, the [d]epartment, and grant to it all reasonable inferences fairly deducible from the evidence." *King v. King George Dep't of Soc. Servs.*, 69 Va. App. 206, 210 (2018) (quoting *C. Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 420-21 (2012)).

[5] The record in this case is sealed.  "[T]his appeal requires unsealing certain portions to resolve the issues raised by the parties." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022).  We unseal only the facts mentioned in this opinion. *See id.*  The rest of the record remains sealed.

[6] The record reflects that the father has been repeatedly incarcerated and released throughout the department's involvement with the child.

entered foster care for a second time. This occurred after the department received a report that the child had been walking outside alone early in the morning. Due to his disabilities, he could not speak to identify himself but was eventually identified by a department employee. Law enforcement officers searched for the mother and found her and the boyfriend asleep at the boyfriend's home.[7] Afterward, the department provided the mother with mental health and medication management services while the child remained in foster care. The mother participated in the services, obtained housing, achieved financial stability, and ultimately regained custody of the child in July 2019. At the time of the child's return, he had been in the custody of the department for almost two additional years. As before, the custody was subject to the condition that the boyfriend could not have contact with the child.

About seven months later, in February 2020, again while the father was incarcerated, the department received a report that the mother and the boyfriend had a physical altercation at the mother's home while the child was present. The department determined that the mother had again violated the court's order prohibiting contact between the child and the boyfriend. As a result, the child entered foster care for a third time. The department offered the mother "an abundance of services," but she declined to participate in any of those services, stating that she had "graduated from her outpatient therapy" and "no longer needed" help with "medication management." The department also filed a foster care plan in the juvenile and domestic relations district court (the JDR court) with the primary goal of relative placement.

In August 2020, the mother tested positive for oxycodone and methamphetamine. The department petitioned the JDR court to terminate the parental rights of the mother and father and approve a foster care plan goal of adoption. Following a hearing, the JDR court terminated the

---

[7] The mother told the police that she was unaware that the child had left her boyfriend's home or that the boyfriend was prohibited from having contact with the child following the earlier founded complaint of physical abuse.

mother's and father's parental rights and approved the foster care goal of adoption. The mother and father appealed to the circuit court. After hearing the evidence and arguments, the circuit court entered an order directing the department to return the child to the mother's custody, which it did in June 2021. At the time of the June 2021 return, the child had spent an additional fifteen months in the department's custody.

In January 2022, the department received a report regarding an additional incident of domestic abuse. The incident involved the mother and a man she had invited into her home (with whom she shared an adult child), both of whom sustained injuries in the altercation. The child, then fourteen years old, was present in the house during the fight. Although the child may have been on a different floor of the residence, it was undisputed that the disagreement was loud. The mother also reported to the department that she and the child's father had "engaged in" a recent "domestic dispute in her home" when she allowed him to live there following his most recent release from incarceration in late 2021.

Following these incidents, the department requested that the mother complete a hair-follicle drug screening, but she refused. The JDR court subsequently ordered her to submit to the screening, which was positive for methamphetamine and cocaine. The department immediately removed the child from the mother's care based on the results of her drug test and her history with the department. It noted that the father had been incarcerated during previous removals, his whereabouts were unknown to the department, and he had not been involved in the child's life. The department further observed that the father had not worked with the department to receive services or custody and instead supported the mother's retention of custody. This was the fourth removal of the child in a nine-year period.

The JDR court entered an emergency removal order and a preliminary removal order and adjudicated that the child had been abused or neglected. The department then filed a foster care

plan with the primary goal of relative placement and a concurrent goal of adoption. In April 2022, the JDR court entered a dispositional order approving the plan.

The mother and father appealed the JDR court's ruling to the circuit court. At the hearing on the appeals, the department introduced copies of its records relating to the child without objection. The department also presented evidence that the child had been inside the mother's home during the most recent incident of domestic violence.[8]

Dr. Claire Mundy, a licensed clinical psychologist, testified that following the child's entry into foster care in 2018 and again in 2022, she evaluated the mother's psychological condition and parenting capacity. Dr. Mundy determined that the mother's behavior "suggested that she was experiencing a pretty severe mental disorder at the time" of the 2022 evaluation, as well as "some significant" depression, anxiety, and "distrust." The doctor further noted the department's foster care records showed "repeating . . . concerns about [the mother]'s use of illegal drugs."

Dr. Mundy testified that the mother had a "rescuing desire . . . where she tries to take care of people who are in need even though they are in positions that could be very, very harmful to herself and to her child." Mundy added that "brain studies" show that a child does not have to be hit or even to see domestic violence for it to cause psychological damage and that just hearing it can cause harm. She noted that the mother acknowledged a "repeating pattern of her bringing in different men [with whom she had] been [in] domestic abusive relationships."[9] The doctor opined that the mother

---

[8] The mother testified that the incident occurred on the first floor of her home while the child was upstairs. It was undisputed, however, that an "audible disorder" could be heard in the background of a contemporaneous phone call to authorities. The mother also stated that she was "sure [her] neighbors had called [the police] too," tending to indicate that if the altercation was audible to the neighbors from inside the first floor of her home, it likely also was audible to the child upstairs. Additionally, the child was present while the police were at the home investigating, and the mother had a visible lump on her forehead.

[9] The record demonstrates that the mother's history of abusive domestic relationships dated back to at least 2011, when she, her older child, and her then-boyfriend had some sort of

displayed "a pattern of difficulty placing [the child]'s needs as primary to her own" as shown by her "allowing strangers . . . [and] ex-abusers to come into her house."

Dr. Mundy also testified about the mother's participation in the services that the department had previously offered her. She explained that, although the mother was "quite skilled at jumping through the hoops that the [d]epartment ask[ed] her to do," she had been unable to apply what she learned from her parenting classes or individual therapy. Mundy added that after the department "backed out of [the mother's] life[,] she discontinued her treatment," despite admitting that she "knew it was important for her to stay in treatment." Summarizing, the doctor testified that "every six or eight months once the [DSS] magnifying glass is off of [the mother], . . . everything starts falling apart."

The department maintained that it "had extensively explored" returning the child to the mother's custody but concluded that a goal of relative placement or adoption was in the best interests of the child due to the family's "extensive history" with the department. The department "offered an abundance of services" during the first three foster care "episodes." The mother ceased participating in services offered by the department in 2020, after the child had been placed in foster care for the third time. At that time, the mother reported that she "felt like she had graduated from her outpatient therapy" and "no longer needed any medication management services." The department also noted that it had been unable to observe the child's interactions with the father because he had "predominantly been incarcerated during each foster care episode." Finally, the evidence established that at the time of the hearing, the child had spent a total of four years and six months of his fourteen-year lifetime in foster care.

---

physical altercation. She admitted to Dr. Mundy in 2018 and to the department in 2022 that her relationship with the father also involved domestic violence.

Following the close of the department's evidence, the father testified that he had "been with [the mother] off an[d] on." He suggested that she was a very good parent who protected the child from danger. He reasoned that she "made sure" the child was safe by calling the police following her most recent physical altercation in her home in January 2022. The father admitted that although the child knew who he was, he personally had not been very involved in raising the child. He conceded that he had been in and out of incarceration for a period of close to 25 years, more than half his own life and all of the child's, due to what he described as "an endless cycle" of probation violations. The evidence further established that during the months before the child's February 2022 removal, the father's involvement had a negative impact on the mother and the child. Following the father's release from incarceration in November 2021, the mother allowed him to live in her home with her and the child. During that time, she and the father used methamphetamine together. The father last saw the child in early January 2022, before the mother "kicked [him] out" or the father "decided to leave." Then he was "locked up" again on April 1 of that year. His reincarceration was for a period of two years, rendering him incapable of caring for the child or even seeing him outside a prison setting for that period of time.

The mother also testified. She admitted she was involved in a physical altercation in her home in January 2022, while the child was also in the residence. She claimed she was the victim and that her visitor, the father of her adult child, attacked her when she asked him to leave. When asked whether she had enrolled in any new services since the child most recently "came into care," the mother said no, but she asserted that she consistently participated in medication management services once every two months and that doing so "kept [her] mental health stable." The mother admitted that she had used methamphetamine with the father following his most recent release from incarceration in November 2021, but she insisted she had not used any illegal substance after her

court-ordered hair-follicle screening for drug use in February 2022. She denied that she had used cocaine "unless it was in the meth."

The circuit court found that the child had been abused and neglected as shown by the mother's using illegal substances and allowing "domestic violence to go on continuously in front" of or around the child. The court entered a dispositional order transferring custody of the child to the department and approving its foster care plan with the goal of relative placement and a concurrent goal of adoption.

ANALYSIS

The parents assert on appeal that the circuit court erred by approving the removal of the child and the foster care goals of relative placement and adoption. On review, "we presume the [circuit] court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 699 (2022) (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

I. Removal

Courts have the authority to remove a child from a parent's custody when the child is alleged to have been abused or neglected. Code §§ 16.1-251 (emergency removal orders), -252 (preliminary removal orders). Code § 16.1-228(1) defines an abused or neglected child as any child "[w]hose parents . . . create[] or inflict[], threaten[] to create or inflict, or allow[] to be created or inflicted upon such child a physical or mental injury other than by accidental means, or create[] a

- 9 -

substantial risk of death, disfigurement or impairment of bodily or mental functions." The Code expressly provides for intervention where "[t]he child would be subjected to an imminent threat to life or health to the extent that severe or irremediable injury would be likely to result if the child were returned to or left in the custody of his parent[]." Code § 16.1-251(A)(1); *see D. Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 342, 364 (2012).

Here, the parents assert that the circuit court erred by approving the removal of the child because the department failed to prove that the child was abused or neglected or subject to an imminent threat to life or health. The mother claims that the "sole evidence of abuse or neglect" presented by the department was that the child had been present in her home during her physical altercation with the father of her oldest child. She also argues that the department failed to prove that the child was affected by the altercation or subject to "an imminent risk of harm by exposure to future incidents of domestic violence." The mother maintains that the results of her drug screening also failed to justify the child's removal because the department did not present evidence that drugs were found in her home, that she had been impaired, or that she could not care for the child.

Like the mother, the father asserts that the department failed to prove that the child was affected by the mother's most recent physical altercation. He suggests that the fact that the department waited twenty days after the altercation to effect the removal demonstrates that the child was not subject to imminent harm. He further argues that removal of the child from the mother's custody was not in the child's best interests.[10]

---

[10] The father argues for the first time on appeal that the department's decision to remove the child violated the mother's due process rights. We assume without deciding that the father has standing to assert a violation of the mother's due process rights. *See Podracky v. Commonwealth*, 52 Va. App. 130, 134 (2008) (assuming without deciding that the appellant had standing to assert a constitutional challenge in order to decide the case on the best and narrowest ground available). Nonetheless, we do not consider the father's argument on appeal because he did not present it to the circuit court. *See* Rule 5A:18; *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019).

Although the mother and father maintain that the child was not affected by the mother's most recent physical altercation, "[t]he statutory definitions of an abused or neglected child do not require proof" that the child experienced "actual harm or impairment." *C. Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 416 (2012) (quoting *Jenkins v. Winchester Dep't of Soc. Servs.*, 12 Va. App. 1178, 1183 (1991)). Rather, the term "substantial risk" as used in Code § 16.1-228(1) "speaks *in futuro*." *Id.* (quoting *Jenkins*, 12 Va. App. at 1183). In this case, the department presented evidence that the mother repeatedly subjected the child to the risk of physical abuse and displays of domestic violence. Specifically, the mother took the nonverbal autistic child to her then-boyfriend's home despite the department's prohibition on any contact between him and the child based on its finding that he had physically abused the child five months earlier, leaving strangulation marks on his neck. At least two additional times, the department found the boyfriend in the mother's home while the child was also there, despite the no-contact order. Further, on another occasion, she invited the father of her adult child to her home even though she had admitted to Dr. Mundy that her past relationship with him had been abusive. She and the older child's father then became engaged in a loud altercation that resulted in two simultaneous calls to police and visible injuries to both parties. Dr. Mundy explained the mother's pattern of behavior stemmed from her desire to rescue people who "could be very, very harmful to herself and to [the] child." The doctor also emphasized studies showing that just hearing domestic violence can cause psychological damage to a child.

Along with subjecting the child to domestic violence, the mother also exposed the child to her illegal drug use. In 2020, she tested positive for methamphetamine.[11] Then in 2022, when she tested positive for methamphetamine and cocaine after initially refusing to take the test, the

---

[11] The mother had previously been found guilty of a drug offense in 2003, received a suspended sentence, and was released from probation for that offense in 2006, the year before the child was born.

department immediately removed the child from her custody. The mother admitted that she used methamphetamine with the father while he was staying at her house with her and the child. Although the mother claims that the department failed to prove that her substance abuse rendered her unable to care for the child, this Court has recognized that a parent's "continued drug use" can create "an unsafe environment" for her child. *D. Farrell*, 59 Va. App. at 364. We have upheld a finding of abuse and neglect where a mother "allowed an environment to exist 'that presented a substantial risk of impairment to the bodily or mental functions of [a child] if the [d]epartment . . . allowed the child[] to be subjected to those conditions.'" *Id.* at 365 (third alteration in original) (quoting *Jenkins*, 12 Va. App. at 1183).

In sum, the circuit court was not plainly wrong in finding that the child had been abused or neglected, as shown by the mother's combined actions of using illegal substances and allowing "domestic violence to go on continuously in front" of or around the child, especially in light of the earlier finding of abuse based on the incident involving the choking of the child himself. Further, under such circumstances, the circuit court was not plainly wrong in finding that the child would be subject to an imminent threat to life or health under Code § 16.1-252(E) if left in the mother's custody.

Notwithstanding the circuit court's findings regarding abuse and neglect, the father argues that the court erred by removing the child from the mother's custody because the department failed to prove that it made reasonable efforts to prevent the removal of the child and that no less drastic alternatives to the removal of the child were available.[12] In support of his argument, the father

---

[12] The mother also claims that the circuit court erred by upholding the removal of the child because the department failed to prove that it made reasonable efforts to prevent the removal. The mother, however, does not offer any argument or authority in support of her position. *See* Rule 5A:20(e) (requiring an opening brief to include supporting "principles of law and authorities"). We conclude that the mother's omission of argument and authority in support of this specific issue is significant and, as a result, that her argument is waived. *Conley v. Commonwealth*, 74 Va. App. 658, 681 (2022).

suggests that the department could have provided services to the mother that were "less drastic than the removal of the child from" her home.

The department generally must prove that it made reasonable efforts to prevent the removal of the child, which may include providing various services to the parent or legal custodian. Code §§ 16.1-251(A)(2), -252(E)(2). However, proof of such efforts is not required "[w]hen [the] child is removed from his home and there is no reasonable opportunity to provide preventive services" prior to that removal. *Id.* In this case, the department took emergency custody of the child as soon as it discovered that the mother had tested positive for methamphetamine and cocaine. The record also reflects that the department provided extensive services to the mother during prior years, before the child entered foster care for the fourth time. Despite undergoing two sets of psychological and parental capacity evaluations, participating in individual therapy and medication management, attending parenting classes, and working with a parenting coach, the mother seemed unable to apply what she learned and discontinued treatment even though she acknowledged knowing "it was important for her to stay in treatment."[13] She further demonstrated a pattern in which "everything" in her and the child's lives "start[ed] falling apart" "every six or eight months once the [department's] magnifying glass [wa]s off of her."

Consequently, the circuit court did not err by finding that the department made appropriate efforts to prevent the removal of the child. *See* Code §§ 16.1-251(A)(2), -252(E)(2). Because the circuit court was not plainly wrong in finding that (1) the child had been abused or neglected and would be subject to an imminent threat to life or health under Code § 16.1-252(E) if left in the mother's custody and (2) the department made efforts to prevent the removal of the child, we hold that the circuit court did not err by approving the removal.

---

[13] The department attempted to help the mother address her own mental health issues, which included bipolar disorder and a history of trauma. Other services provided to her included aid in finding stable housing, budgeting, and developing daily living skills.

## II. Foster Care Goals

The mother claims that even if the department's evidence proved the child had been abused or neglected, her most recent physical altercation did not support the circuit court's approval of the department's foster care plan, which included concurrent goals of relative placement and adoption. The father contends that returning the child to the mother's custody was in the best interests of the child.

"A preponderance-of-the-evidence standard governs judicial review of . . . foster care plan recommendations . . . ." *Najera v. Chesapeake Div. of Soc. Servs.*, 48 Va. App. 237, 240 (2006). Contrary to the mother's suggestion that the department based its foster care plan solely on her most recent physical altercation, the department asserted that it developed the plan based on its extensive history with the family dating back to 2011. Indeed, the department had "extensively explored" returning the child to the mother's custody during prior removals. As previously discussed, however, the record supports a finding that the mother repeatedly subjected the child both to substance abuse and a risk of physical and emotional harm from domestic violence. Moreover, Dr. Mundy determined that the mother repeatedly failed to apply what she had been taught by the services that the department had provided to her. Given the mother's pattern of behavior and the department's history with the family, which involved three prior removals of the child and a total of more than four-and-a-half years in foster care, the circuit court did not err by concluding that a foster care goal of relative placement with a concurrent goal of adoption was in the best interests of the child. Although fourteen years old, the child was mostly nonverbal and had Down syndrome, autism, and other special needs suggesting he would require care for the foreseeable future. The mother demonstrated over and over her inability to provide for those needs on a consistent basis. On these facts, the circuit court did not err by approving the concurrent foster care plan goals of relative placement and adoption. *Cf. Richmond Dep't of Soc. Servs. v. L.P.*, 35 Va. App. 573, 585

(2001) (observing in a termination-of-parental-rights case that requiring a child to "[w]ait[] indefinitely to find out if the mother might someday remedy the conditions that resulted in [the child's] foster care placement only prolongs the lack of stability and permanency in [the child's] life").

## CONCLUSION

We hold that the evidence supports the findings that the child had been abused or neglected and was subject to an imminent risk of harm, that the department made reasonable efforts to prevent the removal of the child, and that no less drastic alternatives to removal were available. We further determine that the evidence supports the conclusion that the goals of relative placement and adoption were appropriate. Accordingly, the circuit court's judgment is affirmed. We remand the father's case to the circuit court solely to correct the spelling of his middle name in the style of the case. *See supra* note 1.

*Affirmed and remanded, Record No. 0098-23-3.*
*Affirmed, Record No. 0156-23-3.*